[No. 15044–8–I.   Division One.   October 26, 1987.]

ROBERT BROTEN, *Appellant,* v. STERLING W. MAY,
ET AL, *Respondents.*

*Reed P. Schifferman, Frankie A. Crain,* and *Williams, Lanza, Kastner & Gibbs,* for appellant.

*William R. Hickman* and *Reed, McClure, Moceri, Thonn & Moriarty,* for respondents May.

*Stephen G. Palken, Orly J. Sorrel,* and *Sorrel & Palken,* for respondents McDermott Group.

DURHAM, J.*—At the close of Robert Broten's case, the trial court dismissed his claims against The McDermott Group, Inc. (McDermott) for tortious interference with a contractual relationship and for violation of the Consumer Protection Act. At the same time the trial court dismissed McDermott's counterclaim against Broten for violation of the Consumer Protection Act. After subsequent hearings, the trial court held that McDermott was liable for Sterling W. and Marie S. May's attorney fees under an equitable indemnity theory. We remand for reconsideration of the amount of May's recoverable attorney fees, but affirm all other aspects of the trial court's decision.

Prior to 1979, Sterling W. and Marie S. May decided to sell commercial property they owned in Seattle. May's intent was to minimize his federal income tax burden by investing the proceeds of that sale in the purchase of other commercial property in a like–kind exchange. Two commercial brokerage firms, Grubb & Ellis Commercial Brokerage Company (Grubb & Ellis) and McDermott competed directly with each other as real estate brokers. At all relevant times, Grubb & Ellis was represented by Robert Broten, a licensed real estate agent, and McDermott was represented by Rodger Benson, an associate real estate broker. Broten and Benson actively competed to represent May. Benson prevailed, and May signed a commission agreement and exclusive right to lease, sell or trade on March 5, 1979. Prior to August 1979, Broten had reviewed a copy of the agreement and knew of the exclusive agency. Yet, he also communicated directly to May, without the

---

*This appeal was heard by a Supreme Court Justice, a Superior Court Judge, and a retired Superior Court Judge sitting as Court of Appeals Judges Pro Tempore in Division One.

knowledge of McDermott and Benson, giving May advice from time to time regarding negotiations Benson was conducting for the sale of the Seattle property.

On September 17, 1979, May executed a real estate purchase and sale agreement for the Seattle property. Benson negotiated the $2.2 million sale price. McDermott's commission was $110,000, which was not to be paid until May purchased his exchange property, or until the agreement otherwise closed.

On September 27, 1979, May granted an exclusive agency to Broten, McDermott's competitor. McDermott's exclusive agency had expired on August 31, 1979, and May never entered into a written extension of that first exclusive agreement. Thus, as of September 27, the only exclusive agency in effect was Broten's. Benson became aware of Broten's exclusive agency later that fall.

In January 1980, McDermott entered into a cobrokerage agreement for the sale of a building in Kennewick called the Columbia Center. In March, Benson presented the building to May without first informing Broten or Grubb & Ellis. Benson negotiated on behalf of May an agreement to purchase the Columbia Center and to apply the proceeds of the Seattle property sale to its purchase in a like–kind exchange. The agreement was signed on May 23, 1980. Benson was reminded twice of Broten's exclusive agency, once in May and once in June, but he continued to negotiate directly with May rather than through Broten. Prior to closing Benson knew that Broten was claiming that he was entitled to share in the commissions. When May discussed Broten's claim with Benson, Benson assured May that he would take care of Broten.

The Columbia Center transaction closed on July 14, 1980. McDermott thereupon received $110,000 retained from the Seattle sale, and an additional $100,000 for the Kennewick purchase. McDermott's cobroker, Smart, Inc., received a $75,000 commission for the Kennewick transaction. Broten and Grubb & Ellis received nothing, having performed no work on the Kennewick transaction.

Grubb & Ellis sued May, Benson and McDermott to recover a share of those commissions.[1] Grubb & Ellis thereafter assigned its claims to Broten, who was duly substituted as plaintiff.[2] The defendants entered cross claims and counterclaims. After procedural maneuverings, the following claims were tried before the trial court:

1. Broten's claims against McDermott
   a. for tortious interference with business relationship, and
   b. for violation of the Consumer Protection Act;
2. Broten's claim against May for failure to protect his right to a commission;
3. McDermott's counterclaim against Broten for Consumer Protection Act violations;
4. May's cross claim against McDermott for indemnity should Broten recover a judgment from May.

Trial commenced in June 1984. After the plaintiff presented his case, the trial court dismissed both of Broten's claims against McDermott, Broten's claim against May, and McDermott's counterclaim against Broten. May's cross claim against McDermott was tried in October 1984. The trial judge held that McDermott was liable for May's reasonable attorney fees and costs.

Broten appealed the dismissal of all his claims, but later stipulated to dismissing the appeal of his claim against May. McDermott cross–appealed the dismissal of its counterclaim and appealed the judgment for May's attorney fees. That leaves the following claims on appeal:

---

[1] Also named as defendants were Columbia Horizons, a partnership, which owned the property May purchased, and Smart, Inc. All claims and cross claims involving Columbia Horizons and Smart, Inc., were dismissed either before trial or at trial.

[2] McDermott argues on appeal that Broten can only assert the claims of Grubb & Ellis, because he is suing as "assignee". However, the order substituting Broten as plaintiff does not so limit his status. Moreover, the substitution was made in September 1982, long before the June 1984 trial; McDermott cannot allege that it had insufficient time to meet the change in parties. Thus, we reject McDermott's argument.

1. Broten's claim against McDermott for tortious interference.
2. Broten's claim against McDermott under Consumer Protection Act.
3. McDermott's counterclaim against Broten under Consumer Protection Act.
4. May's cross claim against McDermott for attorney fees.

### TORTIOUS INTERFERENCE CLAIM

The elements for the tort of interference with business relations are as follows:

(1) existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy by the alleged interfering party; (3) intentional interference inducing or causing breach or termination of the relationship or expectancy; and (4) resultant damage.

*Sea–Pac Co. v. United Food & Comm'l Workers, Local 44,* 103 Wn.2d 800, 805, 699 P.2d 217 (1985); *Calbom v. Knudtzon,* 65 Wn.2d 157, 162–63, 396 P.2d 148 (1964).

The trial court dismissed Broten's tortious interference claim, holding that Broten had not satisfied the tort's first element. We agree. Broten is attempting to recover a commission from the Kennewick transaction. In order to do so under a tortious interference claim, Broten must show the existence of a valid commission agreement or a valid business expectancy in a commission. This Broten has failed to do.

We first turn to the existence of a valid commission agreement. Broten has attempted to satisfy this requirement by proving the existence of his exclusive agreement with May. That agreement, however, did not entitle Broten to a commission; rather, it provided that "any compensation for [Broten's] services will come from the commissions paid by the selling party." Broten's contract, although otherwise enforceable between Broten and May, did not constitute an independently enforceable commission agreement. Such an agreement would not exist until all the bro-

kers agreed on the division of the selling party's commissions. Therefore, Broten has not shown the existence of a valid commission agreement.

Of course, our analysis does not end there. Broten can recover if he has shown a valid business expectancy in a commission.

[A]n existing enforceable contract is not necessary to support an action for interference with business relationships. All that is needed is a relationship between parties contemplating a contract, with at least a reasonable expectancy of fruition.

*Scymanski v. Dufault,* 80 Wn.2d 77, 84–85, 491 P.2d 1050 (1971); *see also F.D. Hill & Co. v. Wallerich,* 67 Wn.2d 409, 415, 407 P.2d 956 (1965). Therefore, Broten can still recover if at the time of McDermott's interference there was a reasonable expectancy that a commission agreement including him would be executed in the future.

We conclude, however, that no such reasonable expectancy existed. A commission agreement including Broten would have required McDermott's consent. Yet the record reveals many times over that McDermott was not going to allow Broten to share in the commission, no matter what the circumstances. Broten, therefore, could not have reasonably expected that McDermott would enter into the commission agreement. Because Broten has been able to show neither a commission agreement nor a reasonable expectancy in one, Broten has failed to satisfy the first element of tortious interference. The trial court's dismissal of that cause of action was proper.

### Consumer Protection Act Claims

The trial court dismissed both Broten's Consumer Protection Act claim and McDermott's Consumer Protection Act counterclaim. The findings of fact and conclusions of law show that the trial judge dismissed these claims because both parties had violated the law and the ethics of the real estate profession. This reason is not by itself sufficient to justify dismissing the claims. This is not a case in

equity in which claims will be dismissed if their proponents do not come into court with "clean hands". Rather, the merits of each claim must be examined and damages awarded to each and every party presenting a meritorious claim. We hold, however, that neither Broten nor McDermott can recover under the Consumer Protection Act because neither can satisfy the public interest requirement.

The Washington Supreme Court has recently reformulated the necessary elements which a private party must show to recover under the Consumer Protection Act, RCW 19.86.090. In *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.,* 105 Wn.2d 778, 719 P.2d 531 (1986), the court set out the following five elements: (1) an unfair or deceptive act or practice; (2) in trade or commerce; (3) which affects the public interest; (4) which act causes (5) injury to the plaintiff's business or property. *Hangman Ridge,* at 784–85.

The third element, the public interest aspect, was further reformulated in *Hangman Ridge.* We must determine if the context of the allegedly wrongful acts was "essentially a consumer transaction" or rather "essentially a private dispute". *Hangman Ridge,* at 789–90. This case centers around a commission dispute between rival realty agencies. The dispute is between competitors, not between a business and a consumer, and therefore, concerns "essentially a private dispute".

█ Even "private disputes", however, can affect the public interest under the *Hangman Ridge* analysis. The following four factors, although not dispositive in themselves, are indicia of an effect on public interest by private disputes:

(1) Were the alleged acts committed in the course of defendant's business? (2) Did defendant advertise to the public in general? (3) Did defendant actively solicit this particular plaintiff, indicating potential solicitation of others? (4) Did plaintiff and defendant occupy unequal bargaining positions?

*Hangman Ridge,* at 790–91. The last two factors are most

relevant to this case. McDermott in no way solicited Broten or Grubb & Ellis' business, and the two agencies occupied equal bargaining positions. Furthermore, there is little "likelihood that additional plaintiffs have been or will be injured in *exactly* the same fashion". (Italics ours.) *Hangman Ridge,* at 790. Hence, this private dispute does not affect the public interest. Both Broten's and McDermott's Consumer Protection Act claims were properly dismissed.

## May's Attorney Fees

The trial court held that McDermott was required to indemnify May for his attorney fees. Liability was based on Benson's promises that he would take care of Broten coupled with Benson's subsequent failure to protect May from litigation.

The general rule in this state is that in absence of contract, statute, or recognized ground of equity, attorney fees will not be awarded as part of the costs of litigation. *Haner v. Quincy Farm Chems., Inc.,* 97 Wn.2d 753, 757, 649 P.2d 828 (1982); *Dauphin v. Smith,* 42 Wn. App. 491, 494, 713 P.2d 116 (1986). One of the recognized grounds of equity under which attorney fees can be awarded is the theory of equitable indemnity. This theory and its elements have been described as follows:

> When the natural and proximate consequences of a wrongful act of A [McDermott] involve B [May] in litigation with others, B may as a general rule recover damages from A for reasonable expenses incurred in that litigation, including attorney's fees.
> Three elements are necessary to create liability: (1) a wrongful act or omission by A toward B; (2) such act or omission exposes or involves B in litigation with C [Broten]; and (3) C was not connected with the initial transaction or event, *viz.,* the wrongful act or omission of A toward B.

*Dauphin v. Smith,* at 494 (quoting *Manning v. Loidhamer,* 13 Wn. App. 766, 769, 538 P.2d 136, *review denied,* 86 Wn.2d 1001 (1975)).

The first element, McDermott's wrongful act toward

May, is present in this case. The trial court found that McDermott failed to defend May after Benson, McDermott's agent, assured May that Broten would be taken care of. This finding is supported by substantial evidence. Testimony at trial established that Benson's failure to protect May from involvement in the dispute violated both the Code of Ethics for the real estate profession[3] and the standards of the profession. An expert witness testified that the possibility of a suit was readily apparent a month or two before closing, and therefore McDermott should have offered May a hold harmless agreement or taken steps to negotiate a settlement with Broten. McDermott's failure to accept the tendered defense constituted a wrongful act in light of Benson's earlier assurances to May.

The second element is also present; McDermott's wrongful acts caused May to become involved in Broten's litigation. If Benson had done what he was supposed to under the industry standards and the Code of Ethics, May would not have become involved. By way of cross claim,[4] May tendered defense of the action to McDermott and further requested that McDermott indemnify him for any liability he might have to Broten. McDermott's failure to accept the tendered defense by its very nature caused May to become involved in the litigation.

The third element, Broten's noninvolvement in McDermott's wrongful acts, was also proved in this case. Broten was not involved in McDermott's assurances to May nor was he involved in McDermott's refusal to accept May's

---

[3]The Code of Ethics is admissible in this litigation to show the wrongfulness of McDermott's acts under this theory. It is relevant because the wrongfulness of McDermott's acts is an element of May's equitable indemnity claim. The code parallels the standards of the real estate profession. Industry standards are generally admissible as evidence of standard of care. *Haysom v. Coleman Lantern Co.*, 89 Wn.2d 474, 487, 573 P.2d 785, 93 A.L.R.3d 86 (1978). We therefore hold that the trial court did not abuse its discretion in admitting the code.

[4]Despite McDermott's vague objections to this procedure, a tender by way of cross claim is timely and valid. Additionally, the findings of fact accurately describe May's tender.

tendered defense. The mere fact that Broten separately involved May in the litigation is not dispositive of McDermott's liability. Broten obviously could have taken steps which would have protected May from the litigation. Most notably, he could have refrained from suing May. Arguably, Broten's suit also wrongfully exposed May to litigation, because he, too, had the obligation as a real estate broker to protect May from interbroker commission disputes. But these factors do not affect McDermott's liability to May. The third element requires that for May to recover, Broten must not have been connected to McDermott's wrongful acts. That element is met because any wrongful acts of Broten were wholly independent of McDermott's wrongful acts. Because all three elements have been proved, we affirm the trial judge's holding that May is entitled to recover under the equitable indemnity theory.[5]

We must next decide if the trial judge correctly calculated the amount of fees that May is entitled to recover. The dispute over the amount of the fees centers around problems of segregating those portions of May's attorney fees which are chargeable to McDermott from those which are not. The parties agree that May is entitled to recover for the attorney fees he incurred in defending against the claims brought against him in the June trial, but he is not entitled to recover attorney fees incurred in pursuing his cross claim against McDermott in the October trial. Accordingly, the trial judge awarded to May attorney fees incurred up through the end of the June trial, but did not award any fees that arose after that point. McDermott contends, however, that some of the attorney fees May

---

[5]McDermott also argues that the trial court improperly awarded recovery to May based on theories for which May was denied leave to add to his cross claim. McDermott contends that some of the trial court's finding of fact supported recovery under these unpleaded claims. We reject these arguments. The findings of fact are all relevant to the equitable indemnity theory. Simply because some of the same facts might also support recovery under similar theories does not imply that those other theories were tried in the case. There is absolutely no indication that the trial judge based his conclusion on the unpleaded claims.

incurred in preparing for the June trial related to prosecution of the cross claim. May has not disputed this point. Therefore, the trial judge's calculation of May's damages includes some nonallowable attorney fees.

May argues that this calculation was proper because one who wrongfully fails to defend another should be liable for nonrecoverable costs of defense if there exists "no reasonable means" of segregating them from recoverable costs. *See National Steel Constr. Co. v. National Union Fire Ins. Co.*, 14 Wn. App. 573, 576, 543 P.2d 642 (1975). However, we do not know if reasonable means exist for segregating these fees, because the trial judge did not expressly address this issue in his findings of fact and conclusions of law. Moreover, our State Supreme Court has recently held that difficulty or complexity does not justify a failure to segregate attorney fees. *Fisher Properties, Inc. v. Arden–Mayfair, Inc.*, 106 Wn.2d 826, 850, 726 P.2d 8 (1986). *See also Boeing Co. v. Sierracin Corp.*, 108 Wn.2d 38, 66, 738 P.2d 665 (1987); *Nordstrom, Inc. v. Tampourlos*, 107 Wn.2d 735, 743, 733 P.2d 208 (1987). The trial judge has already partially segregated the fees by disallowing recovery for those connected with the October trial. Nevertheless, further segregation is necessary if reasonable means exist for doing so, regardless of the difficulty or complexity involved.

Accordingly, we remand this case for further consideration of May's attorney fees. In all other respects, the trial court's judgment is affirmed.

ENNIS and HANSEN, JJ. Pro Tem., concur.

Review denied by Supreme Court February 1, 1988.