[No. 23114–6–I.   Division One.   July 31, 1989.]

BIRKENWALD DISTRIBUTING CO., *Appellant*, v. HEUBLEIN, INC., *Respondent*.

*David R. Lord* and *Ferguson & Burdell,* for appellant.

*Vivian I. Raits, James H. Clarke, Robert Maloney,* and *Spears, Lubersky, Bledsoe, Anderson, Young & Hilliard,* for respondent.

WEBSTER, J.—Heublein, Inc., a wine supplier, canceled a wine distribution agreement with Birkenwald Distributing Company. Birkenwald sued Heublein for wrongful termination under the wholesale distributors and suppliers of wine and malt beverages act. Birkenwald also alleged tortious interference, claiming a $200,000 loss as a result of the cancellation. The trial court held the act inapplicable to preexisting distributorships and dismissed the claim for tortious interference. We affirm.

## FACTS

Birkenwald became Heublein's distributor in 1969. The president and chief executive officer of Birkenwald described the distribution arrangement by deposition as follows:

> We had to pay our bills. That was one of the guarantees.
>
> . . .
>
> And we had to give them distribution commensurate with what they expected. . . . And if we didn't do that, we would no longer be acceptable.

The president believed the relationship would last "forever," but the basis for his belief was "just a handshake and faith."

In 1984, the Legislature passed the wholesale distributors and suppliers of wine and malt beverages act, RCW 19.126. The act grants several protections to wholesale distributors of wine and malt liquor, including a right of "at least sixty days prior written notice of the supplier's intent to cancel

or otherwise terminate" a distribution agreement. RCW 19.126.040(2). The notice must state "all the reasons for the intended termination or cancellation", and the distributor may "rectify any claimed deficiency" within 60 days. RCW 19.126.040(2). The supplier must approve any transfer of the distributor's rights "if the person or persons to be substituted meet reasonable standards imposed by the supplier." RCW 19.126.040(4).

The parties never discussed the length of their relationship or the terms for terminating it, but Birkenwald decided to sell its assets in 1985. Birkenwald informed Heublein of its intentions, and a vice–president of Heublein replied in a letter as follows:

> I must remind you of the fact that the products sold to you by Heublein, Inc., are not for sale. By this I mean we demand the right to approve any purchaser for value prior to entering into any business relationship with them.
> We, therefore, request a formal presentation be submitted before we make any such decision.
> However, in an effort not to disrupt the market, we will continue to ship Birkenwald products on a reasonable basis. Any such orders and our filling of them shall not constitute the establishment of any new relationship between Heublein and Birkenwald.

Heublein ultimately refused to approve a prospective purchaser of Birkenwald's assets and informed Birkenwald that it would cease to be Heublein's distributor in 60 days. Heublein gave no reasons, but said the decision was made "after reviewing the market" and the purchaser's potential.

In response to Heublein's refusal, the purchaser paid $200,000 less for Birkenwald's assets than the price negotiated before the refusal.

## CONTRACT CLAUSE

"A statute is presumed to operate prospectively unless the legislature indicates that it is to operate retroactively." *Agency Budget Corp. v. Washington Ins. Guar. Ass'n,* 93 Wn.2d 416, 424, 610 P.2d 361 (1980). Here, the Legislature intended the act to govern the relationship between suppliers of wine and their wholesale distributors "to the full

extent consistent with the Constitution and laws of this state and of the United States." RCW 19.126.010(2). A party challenging the constitutionality of a statute bears the burden of proving its invalidity beyond a reasonable doubt. *Seattle Taxi, Inc. v. King Cy.,* 49 Wn. App. 617, 620, 744 P.2d 1082, *review denied,* 109 Wn.2d 1018 (1987).

■ Heublein relies on the contract clause of our state and federal constitutions. "No . . . law impairing the obligations of contracts shall ever be passed." Const. art. 1, § 23. This provision is substantially similar to its federal counterpart: "No state shall . . . pass any . . . law impairing the obligation of contracts". U.S. Const. art. 1, § 10. The two clauses are given the same effect. *Washington Fed'n of State Employees v. State,* 101 Wn.2d 536, 539, 682 P.2d 869 (1984).

■ The "threshold inquiry" under the contract clause "is 'whether the state law has, in fact, operated as a substantial impairment of a contractual relationship.'" *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 411, 74 L. Ed. 2d 569, 103 S. Ct. 697 (1983) (quoting *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 244, 57 L. Ed. 2d 727, 98 S. Ct. 2716 (1978)). An impairment is substantial if the complaining party relied on the supplanted part of the contract. *Spannaus,* at 245 (purpose of contract clause is to protect settled contractual expectations).

Here, the parties never discussed termination and approval in case of a sale by Birkenwald. Arguably, this raises a doubt as to whether Heublein relied on a right to terminate Birkenwald at will. However,

> [t]he obligations of a contract long have been regarded as including not only the express terms but also the contemporaneous state law pertaining to interpretation and enforcement. . . . This principle presumes that contracting parties adopt the terms of their bargain in reliance on the law in effect at the time the agreement is reached.

*United States Trust Co. v. New Jersey,* 431 U.S. 1, 19 n.17, 52 L. Ed. 2d 92, 97 S. Ct. 1505 (1977).

■ Prior to the act, Heublein had a contractual right to terminate Birkenwald "for any reason" upon "reasonable notice". *Mayflower Air–Conditioners, Inc. v. West Coast Heating Supply, Inc.,* 54 Wn.2d 211, 215, 339 P.2d 89 (1959). The agreement of the parties supports the presumption that Heublein relied on this right. Birkenwald knew it had to satisfy Heublein's expectations in order to be acceptable to Heublein.[1]

Birkenwald argues that if courts can imply a right to terminate at will, the Legislature can impose a converse obligation to terminate only for cause. However, only a Legislature can "pass" a "law" impairing contractual obligations. Thus, only state legislation implicates the contract clause. *Tidal Oil Co. v. Flanagan,* 263 U.S. 444, 451, 68 L. Ed. 382, 44 S. Ct. 197 (1924).[2]

■ The constitutional framers' concern with legislation exposes a further flaw in Birkenwald's argument. Parties contracting in good faith for a continuing performance presumably *intend* a reasonable time if they do not discuss duration; for this reason, either party may terminate its obligations after a reasonable time has passed. *See Alpha Distrib. Co. of Cal., Inc. v. Jack Daniel Distillery,* 454 F.2d

---

[1]It is irrelevant that the act defines an "agreement of distributorship" as "any . . . commercial relationship, . . . association, or any other arrangement . . . between a supplier and wholesale distributor." RCW 19.126.020(1). The parties surely had an "agreement of distributorship" under this definition after the effective date of the act, but the Legislature cannot avoid constitutional constraints by definition. *See Scott Paper Co. v. Anacortes,* 90 Wn.2d 19, 33, 578 P.2d 1292 (1978) (constitutional meaning of "gift" under Const. art. 8, § 7 cannot be supplied by Legislature). By redefining the inception of the parties' agreement so as to make the act prospective with respect to the "new" agreement, without giving Heublein a limited period during which to avoid the act's operation, the Legislature extinguished an existing contractual right. In contrast, in *Southwest Distrib. Co. v. Olympia Brewing Co.,* 90 N.M. 502, 565 P.2d 1019 (1977), "no agreement, either oral or written, existed between Southwest and Olympia; therefore, no contract was formed." *Southwest Distrib.,* at 506.

[2]By its own terms, the federal contract clause does not apply to the national government. Thus, federal legislation which impairs existing contractual obligations is tested under the due process clause. *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 49 L. Ed. 2d 752, 96 S. Ct. 2882 (1976).

442, 448–49 (9th Cir. 1972) (10–year distributorship; 2 months' notice). In short, when courts imply a right to terminate at will, they do so as a matter of construction, not revision.

Another court rejected the argument that legislation may supplement an agreement which is silent on the subject of the legislation without upsetting the expectations of the parties. *See North Broadway Motors, Inc. v. Fiat Motors of North Am., Inc.,* 622 F. Supp. 466, 470 (N.D. Ill. 1984). There, a car dealer argued that "no specific contractual right" was impaired by Illinois's Motor Vehicle Franchise Act, because the dealer's agreement with its supplier was "silent with respect to allocations of cars".

> This argument evinces a basic misunderstanding of the nature of a contract. A contract is often as important for what it does not say as for what it requires. The agreement's silence on the subject of allocations indicates that the parties did not *intend* to impose upon defendant any duties concerning that subject. Thus, application of the [act] . . . would add a *new duty* to those that [the supplier] agreed to undertake.

(Italics ours.) *North Broadway Motors,* at 470. Similarly, although the parties did not discuss termination or approval in case of sale, this indicates they did not intend to impose any duties in this regard. The act would not simply supplement their agreement, it would revise it; it would impose obligations without regard to the parties' intent.

█ In determining the extent of a contractual impairment, "we are to consider whether the industry the complaining party has entered has been regulated in the past." *Energy Reserves,* 459 U.S. at 411. However, this factor is significant only when one purchases into an enterprise "already regulated in the particular to which he now objects", in which case one is deemed to have "purchased subject to further legislation upon the same topic." *Veix v. Sixth Ward Bldg. & Loan Ass'n,* 310 U.S. 32, 38, 84 L. Ed. 1061, 60 S. Ct. 792 (1940); *see, e.g., Schieffelin v. Department of Liquor Control,* 194 Conn. 165, 479 A.2d 1191 (1984). Where, as here, state law did not regulate termination of distributorship agreements and such regulation was

not foreseeable when the parties contracted, it does not matter that liquor distribution was heavily regulated at the time. *See Jacobsen v. Anheuser–Busch, Inc.,* 392 N.W.2d 868, 873 (Minn. 1986), *cert. denied,* 479 U.S. 1060 (1987).

We conclude that Heublein relied on its right to terminate Birkenwald at will. A mere change of law "is much less likely to upset expectations than a law adjusting the express terms of an agreement." *United States Trust Co.,* 431 U.S. at 19 n.17. But Birkenwald knew it had to satisfy Heublein's expectations to maintain the distributorship. Heublein "reminded" Birkenwald that it had the right to approve any transferee. This indicates that Heublein had an *express,* albeit unwritten, right to terminate Birkenwald at will.

■ Whether the right is express or implied, the contract clause protects it, because the impairment is not justified by a broad societal purpose. *See Jacobsen v. Anheuser–Busch, Inc., supra.* In *Jacobsen,* a beer supplier reserved in writing "the right to approve or disapprove a change in ownership" of its wholesale distributor. 392 N.W.2d at 870. The express, written reservation is distinguishable, but the case is otherwise in point: The court searched for "a significant and legitimate public purpose" behind a retroactive statute requiring approval, *Jacobsen,* at 872 (citing *Energy Reserves,* at 411), and found

> no showing that the disruption of . . . contractual expectations of [the supplier] was necessary to meet any important, broad, and general economic or social problem. Instead, the . . . Act ha[d] all the earmarks of narrow special interest legislation . . . in favor of . . . wholesale distributors.

*Jacobsen,* at 874–75. *Accord, Shell v. Metropolitan Life Ins. Co.,* 380 S.E.2d 183 (W. Va. 1989) (statute prohibiting discharge of insurance agents except for good cause "hardly intended to remedy 'a broad and general social or economic problem' . . . [T]his legislation is designed to protect a narrow class of citizens, i.e., insurance agents, rather than a

broad societal interest. It is not imbued with the substantial public policy that will justify state interference with the private contractual obligations of these parties.").

The facially absolute language of the contract clause is limited to accommodate "the inherent police power of the State 'to safeguard the vital interests of its people.'" *Energy Reserves,* 459 U.S. at 410 (quoting *Home Bldg. & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 434, 78 L. Ed. 413, 54 S. Ct. 231, 88 A.L.R. 1481 (1934)). "The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." *Energy Reserves,* at 412; *see Spannaus,* 438 U.S. at 242 (law must "protect a basic societal interest, not a favored group"). Logically, even minimal impairment of contractual expectations violates the contract clause where there is no real exercise of police power to justify the impairment. The severity of the impairment simply "increase[s] the level of scrutiny to which the legislation will be subjected." *Energy Reserves,* at 411 (citing *Spannaus,* at 245).

Here, we cannot conclude the act is a legitimate exercise of police power rather than an exercise in special interest legislation. When an impairment is sufficiently "severe," and there is "no showing" of an "important general social problem", "[t]he presumption favoring 'legislative judgment as to the necessity and reasonableness of a particular measure,' simply cannot stand". (Citation omitted.) *Spannaus,* at 247 (quoting *United States Trust Co.,* 431 U.S. at 23). The act cites three purposes it is designed to serve: (1) fairness, (2) efficiency, and (3) competitive distribution. RCW 19.126.010. The first purpose is evident from the act's short title, the "wholesale distributor/supplier equity agreement act." RCW 19.126.900. But unfairness does not change special interest legislation into a type that justifies contractual impairment. The second purpose, efficiency, is arguable either way. Litigation between suppliers and distributors who disagree over the cause for termination might

well decrease the efficiency of distribution. The third reason, competition, is doubtful because the act exempts domestic wine suppliers from its scope. RCW 19.126-.020(3)(a).[3]

We conclude the act is not sufficiently justified to impair Heublein's right to terminate Birkenwald at will. Under the contract clause, the act must be limited to distributorship agreements created after its effective date.

TORTIOUS INTERFERENCE

Birkenwald challenges Heublein's termination and refusal to approve its transferee as tortious interference. The elements of tortious interference are:

> (1) existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy by the alleged interfering party; (3) intentional interference inducing or causing breach or termination of the relationship or expectancy; and (4) resultant damage.

*Sea–Pac Co. v. United Food & Comm'l Workers Local Union 44,* 103 Wn.2d 800, 805, 699 P.2d 217 (1985).

The first element requires that the complainant have a legal right to that which he claims to have lost. A defendant "who in good faith asserts a legally protected interest of his own which he believes may be impaired by the performance of a proposed transaction is not guilty of tortious interference.'" *Brown v. Safeway Stores, Inc.,* 94 Wn.2d 359, 375, 617 P.2d 704 (1980) (quoting *Singer Credit Corp. v. Mercer Island Masonry, Inc.,* 13 Wn. App. 877, 884, 538 P.2d 544 (1975)). In *Singer,* the defendant withheld consent to a transfer of property; the court said, "*Singer's refusal to* consent to the proposed arrangement was privileged." 13 Wn. App. at 884. Similarly, in *Broten v. May,* 49 Wn. App. 564, 569, 744 P.2d 1085 (1987), *review denied,* 110 Wn.2d 1003 (1988), the court held that the plaintiff had no reasonable expectancy, because the defendant had a right to withhold its consent.

---

[3]Although Heublein is a Connecticut corporation, we need not decide whether the act could survive a challenge under the commerce clause. *See Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 82 L. Ed. 2d 200, 104 S. Ct. 3049 (1984).

Here, Heublein had a right to terminate Birkenwald at will, and there is no evidence that Heublein exercised its right in bad faith. Birkenwald seeks to appropriate Heublein's right, which it appraises at $200,000, but Birkenwald has no right to this money. Heublein had a right to approve any purchaser for value prior to entering a relationship with the purchaser.

■ The third element, intent, denotes purposefully improper interference. *See Titus v. Tacoma Smeltermen's Union Local 25,* 62 Wn.2d 461, 465–66, 383 P.2d 504 (1963). When one acts to promote lawful economic interests, bad motive is essential, and incidental interference will not suffice. *Titus.* In *Titus,* nonunion employees sued a labor union, because the union promoted a strike at an industrial plant where they worked, causing the plant to close. The court dismissed the claim as a matter of law because there was "no evidence that the defendants' conduct was for any purpose other than to obtain a favorable disposition of its grievances". *Titus,* at 466.

Here, the evidence does not support an inference of bad faith. An inference is

> "'[a] process of reasoning by which a fact or proposition sought to be established is deduced as a *logical consequence* from other facts, or a state of facts, already proved or admitted.'"

*Dickinson v. Edwards,* 105 Wn.2d 457, 461, 716 P.2d 814 (1986) (quoting *Shelby v. Keck,* 85 Wn.2d 911, 541 P.2d 365 (1975)). Birkenwald accused Heublein of conspiring with a distributor which Heublein selected to replace Birkenwald. Heublein allegedly sought to coerce Birkenwald to sell its assets to this distributor and to drive down the price of the assets so the other distributor could purchase them at a bargain. Birkenwald refused to sell its assets to Heublein's selection, choosing instead to sell to the distributor which Heublein refused to approve. But nothing in the record suggests that Heublein intended to harm Birkenwald. Heublein had every right to select the distributor of its choice to replace Birkenwald. Heublein may not have

preferred to do business with Birkenwald's proposed transferee. Heublein allegedly withdrew promotions, forcing Birkenwald to promote the wine itself and to reduce prices, but Birkenwald did not challenge this as a breach of contract. Heublein apparently had a right to withdraw its promotions and to demand promotion from a distributor. Asserting one's rights to maximize economic interests does not create an inference of ill will or improper purpose.

"[A] cause of action for tortious interference arises from either the defendant's pursuit of an improper objective of harming the plaintiff or the use of wrongful means that in fact cause injury to plaintiff's contractual or business relationships." *Pleas v. Seattle,* 112 Wn.2d 794, 803–04, 774 P.2d 1158 (1989). Here, Birkenwald failed to raise an inference of improper purpose or wrongful means. The means were not wrongful because Heublein had a contractual right to select a distributor of its choice to replace Birkenwald. The purpose was not improper because there is no evidence that Heublein asserted its right for any reason other than to select a replacement distributor of its choice. Because Birkenwald lost nothing to which it was entitled, and because it failed to raise an inference of improper purpose, dismissal was proper.

We affirm.

SCHOLFIELD and PEKELIS, JJ., concur.