[No. 33780-1-II. Division Two. October 31, 2006.]

CASCADE AUTO GLASS, INC., *Appellant*, v. PROGRESSIVE CASUALTY INSURANCE COMPANY ET AL., *Respondents*.

*Charles J. Lloyd* (of *Livgard & Rabuse, P.L.L.P.*), for appellant.

*Douglas F. Foley* (of *Foley & Buxman, P.L.L.C.*), for respondents.

¶1 ARMSTRONG, J. — Cascade Auto Glass, Inc., contracted with Progressive Casualty Insurance Company to repair and replace windshield glass for Progressive's policyholders according to a schedule of prices. A year later, Progressive's third-party claims administrator, Safelite Auto Glass, wrote Cascade with new pricing terms, explaining that the new prices superseded all prior agreements. When Progressive started paying Cascade according to the new pricing terms, Cascade sued for the balances due on each bill,

alleging breach of the pricing agreement as well as breach of the individual insurance policies, which Progressive's insureds had assigned to Cascade. The trial court granted summary judgment to Progressive. Cascade appeals, arguing that issues of material fact exist as to whether Progressive breached either the original agreement or its insureds' contracts. We find no error and, therefore, affirm.

## FACTS

¶2 Cascade Auto Glass replaces and repairs automobile glass. Progressive provides automobile insurance requiring it to pay the amount necessary to repair or replace damaged glass. Cascade has replaced and repaired auto glass for Progressive's insureds who, as part of the consideration, have assigned their rights to proceeds due under the insurance policy.

¶3 Cascade and Progressive signed an agreed pricing contract effective April 22, 1999. The pricing contract established the rates Cascade would bill Progressive for parts and labor associated with glass replacement. Specifically, the agreement provided,

> This agreement applies to work completed by the glass shop mentioned above, for a Progressive policy holder. This pricing agreement is solely for the purpose of insuring a fair price for work completed by the above captioned glass shop. The glass shop named above further agrees that each invoice submitted to Progressive Insurance for work completed on a vehicle insured by Progressive Insurance will be billed at the rates and discounts listed above.

Clerk's Papers (CP) at 214. Although the agreement said nothing about how or when either party could terminate it, the parties have agreed that it was terminable-at-will by either party.

¶4 Around November 1999, Progressive hired Safelite Auto Glass to administer claims for glass repair and replacement. In a letter dated May 25, 2000, purporting to supersede any prior pricing agreements, Safelite advised

Cascade of Progressive's new pricing standards for glass repair and replacement as of June 5, 2000. Safelite sent Cascade additional updated pricing standards on June 30, 2000, May 13, 2002, and September 15, 2003, all of which professed to supersede any prior pricing agreement with Progressive. All four letters were unsigned, and "Progressive Insurance" was typed in the signature line. CP at 217-19, 257.

¶5 Cascade continued to perform repairs for customers Progressive insured. After sending the letters, Progressive paid Cascade the new lower amounts listed in the superseding letters rather than the pricing agreement's amounts.

¶6 Cascade sued Progressive, alleging that Progressive breached the pricing agreement as well as the assigned insurance policies that required "fair" payment for "necessary" repairs. CP at 6. Cascade attached to its complaint a 50-page spreadsheet detailing Progressive's underpayments from January 7, 1999, through August 21, 2002, which Cascade claimed amounted to $343,439.43.

¶7 Following discovery, Cascade moved for partial summary judgment on the claim for breach of the pricing agreement. Progressive opposed the motion and filed its own motion for summary judgment on both counts. The trial court granted Progressive's motion and dismissed Cascade's claims.[1]

¶8 The principal issues on appeal are whether Progressive's superseding letters terminated the original pricing agreement and whether, if they did, Progressive could still be liable to Cascade for breaching the individual insurance contracts that required Progressive to pay the amount necessary for Cascade's glass work.

---

[1] The record is unclear as to whether Progressive underpaid some of Cascade's invoices for work done before or during the pricing agreement. The trial court granted Progressive summary judgment on all Cascade's claims and Cascade does not argue or assign error to the court's failure to segregate any claims before or during the agreement's term. Accordingly, we do not address the issue. RAP 12.1(a).

## ANALYSIS

### I. Standard of Review

¶9 We review an order granting summary judgment de novo. *Scottsdale Ins. Co. v. Int'l Protective Agency, Inc.*, 105 Wn. App. 244, 248, 19 P.3d 1058 (2001). In reviewing a summary judgment, we consider all facts and reasonable inferences from them in favor of the nonmoving party. *Lybbert v. Grant County*, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000). Summary judgment is appropriate when the pleadings, affidavits, and depositions show that there are no issues of material fact and that the moving party is entitled to judgment as a matter of law. *Ruff v. County of King*, 125 Wn.2d 697, 703, 887 P.2d 886 (1995).

### II. Breach of Pricing Agreement Claim

¶10 Cascade and Progressive agree that the pricing agreement was terminable at the will of either party. But Cascade argues that because Safelite was not a party to the agreement, it could not terminate it. Moreover, according to Cascade, even if Safelite could terminate the agreement, Progressive's superseding letters were simply an attempt to unilaterally modify the terms of the pricing agreement, which Progressive could not do.

¶11 Cascade's argument that Safelite could not terminate the agreement fails. An agent's exercise of actual authority is binding on the principal. *Blake Sand & Gravel, Inc. v. Saxon*, 98 Wn. App. 218, 223, 989 P.2d 1178 (1999). An agency relationship arises when one party acts at the instance of, and under the direction and control of, another. *Stansfield v. Douglas County*, 107 Wn. App. 1, 17, 27 P.3d 205 (2001). In this case, Progressive submitted evidence that it contracted with Safelite to administer Progressive's glass claims' procedures and fully authorized Safelite to send letters informing Cascade of its updated pricing structure. Progressive participated in drafting the letter and approved the final draft. As such, Progressive authorized

Safelite to act on its behalf and under its direction in altering the pricing agreement to conform to Progressive's new pricing standards.

¶12 In addition, the superseding letters read as if written by Progressive. The letters are headed "Progressive," "Progressive Insurance," or "Progressive National Claims Group." They speak of "our Progressive Insurance customers"; "prices [that] are not the lowest available to us"; and "working with you in providing glass service to our customers." The letters explain that "Safelite Glass Corp. is administering our glass program," and direct Cascade to "send invoices to: Progressive Insurance." CP at 217-19, 257. Cascade presented no evidence that Safelite lacked authority or exceeded the scope of its authority. In short, Progressive presented unrebutted evidence that Safelite had authority to act as its agent in the price setting correspondence. Further, no reasonable reader of the letters could be confused about whether the new price setting came from Progressive or its authorized agent. We turn then to whether the superseding letters terminated the pricing agreement.

■ ¶13 When a contract for a continuing performance fails to specify the intended duration, we construe it to be terminable-at-will by either party after a reasonable time. *Robbins v. Seattle Peerless Motor Co.*, 148 Wash. 197, 199, 268 P. 594 (1928); *Birkenwald Distrib. Co. v. Heublein, Inc.*, 55 Wn. App. 1, 6, 776 P.2d 721 (1989). In addition, the party wishing to terminate the agreement must give reasonable notice to the other party. *Mayflower Air-conditioners, Inc. v. W. Coast Heating Supply, Inc.*, 54 Wn.2d 211, 215, 339 P.2d 89 (1959). Whether notice is reasonable depends on the facts and circumstances of each case. *Lano v. Osberg Constr. Co.*, 67 Wn.2d 659, 663, 409 P.2d 466 (1965).

¶14 The pricing agreement here is silent as to duration and manner of termination. Accordingly, a reasonable time must elapse before the agreement can be terminated by reasonable notice. Cascade does not argue that Progressive terminated the agreement too soon. Instead, Cascade as-

serts that the termination notice was deficient. First, Cascade argues that because the letters were unsigned and mass-mailed, they failed to give adequate notice to any particular glass shop that Progressive was terminating its pricing agreement. Second, Cascade claims that the letters purported to unilaterally modify the terms of the pricing agreement rather than terminate the agreement altogether.

¶15 Whether particular notice was reasonable is ordinarily a question of fact for the jury. *See Serv. Chevrolet, Inc. v. Sparks*, 99 Wn.2d 199, 204, 660 P.2d 760 (1983) (secured party can hold collateral for a reasonable time before collateral is deemed retained in satisfaction of the obligation); *McChord Credit Union v. Parrish*, 61 Wn. App. 8, 12, 809 P.2d 759 (1991) (collateral must be disposed of in a commercially reasonable manner). But when reasonable minds could reach only one conclusion, the court can determine reasonableness as a matter of law. *Havens v. C&D Plastics, Inc.*, 124 Wn.2d 158, 181, 876 P.2d 435 (1994). To defeat summary judgment, Cascade must present sufficient evidence to establish an issue of material fact concerning the reasonableness of Progressive's termination notice. *See* CR 56(c).

¶16 Reasonable notice is notice "fairly to be expected or required under the particular circumstances." BLACK'S LAW DICTIONARY 1091 (8th ed. 1999); *see also Lano*, 67 Wn.2d at 663. Accordingly, whether Cascade presented sufficient evidence that the letter failed to provide reasonable notice depends on the circumstances surrounding the transaction.

¶17 Bradley Nelson testified for Cascade that he signed the pricing agreement and had primary responsibility for negotiating agreements with insurance carriers. In his deposition, Nelson testified that Cascade had concluded numerous pricing agreements with different carriers, that many of the agreements were verbal, that pricing agreements were often reevaluated in response to changes in national pricing standards, and that he had verbally terminated or modified pricing agreements as well as having sent written termination letters.

¶18 According to Nelson, the industry accepts pricing agreements based on informal understandings between parties. Because national pricing standards change frequently,[2] both parties expect that their pricing agreements will be modified or revoked in response to market shifts. Cascade's own evidence suggests that pricing terms can be altered or revoked through informal means, and Cascade submitted no evidence that industry custom led it to expect a more formal termination notice than Progressive's superseding letters. Under these circumstances, that the letters were not signed by an individual or labeled specifically "termination notices" is insufficient to raise an issue of material fact as to whether the notices were reasonable.

¶19 Still, Cascade reasons that the letters did not effectively terminate the pricing agreement because they did not refer to the specific agreement between Progressive and Cascade. Instead, they were "sent to every glass company in the country, whether they had a price agreement or not." Report of Proceedings at 7. This argument is not persuasive. If the letters clearly communicated Progressive's intent to terminate Cascade's existing price agreement, such intent does not become muddled simply because the letters also show Progressive's intent to terminate other agreements. And Cascade cites no legal principle that termination notices must be singular and personal.

¶20 Cascade also maintains that Progressive's notice letters were attempts to modify the agreement, not terminate it; and, continues Cascade, Progressive's attempts to modify the agreement had no legal effect because the agreement could be modified only with its consent.

¶21 But a terminable-at-will contract may be unilaterally modified. *See Mayflower Air-conditioners, Inc.*, 54 Wn.2d at 213; *see also Swalley v. Addressograph Multigraph Corp.*, 158 F.2d 51, 54 (7th Cir. 1946) ("Furthermore, since

---

[2] Nationwide prices for automobile glass and labor are published by the National Auto Glass Specifications (NAGS). In pricing agreements, the NAGS listings often serve as the baseline price from which discounts are negotiated with insurance carriers. NAGS prices are revised and republished quarterly.

the contract was one terminable at the will of either party, it therefore could be modified at any time by either party as a condition of its continuance."); *Flint v. Youngstown Sheet & Tube Co.*, 143 F.2d 923, 925 (2d Cir. 1944) ("[T]he agency contract was terminable at will, and, if the plaintiffs were not content with the defendant's modification of it, if the letter was a modification, they should have refused to go on."). The same rule applies in at-will employment agreements, where an employer may unilaterally change policies and procedures set forth in an employee handbook so long as the employee receives reasonable notice of the change. *Govier v. N. Sound Bank*, 91 Wn. App. 493, 498, 957 P.2d 811 (1998); *Gaglidari v. Denny's Rests., Inc.*, 117 Wn.2d 426, 434, 815 P.2d 1362 (1991). In such cases, a new contract is formed when the employer communicates the new terms (offer), the employee works after receiving notice (acceptance), and the employee continues in employment although free to terminate (consideration). *See Gaglidari*, 117 Wn.2d at 433-34.

¶22 Similarly here, Progressive's superseding letters clearly signaled that it was no longer willing to pay according to the pricing agreement. Instead, Progressive offered to pay according to its new pricing standards. Cascade accepted Progressive's offer by performing glass work for Progressive's insureds. A unilateral contract exists when one party offers to do a certain thing in exchange for the other's performance, and performance by the other party constitutes acceptance. *Knight v. Seattle-First Nat'l Bank*, 22 Wn. App. 493, 496, 589 P.2d 1279 (1979). Cascade created binding unilateral contracts each time it repaired or replaced auto glass for Progressive's insureds after receiving Progressive's new offer. Progressive owes the amounts it promised to pay in the superseding letters; Cascade is entitled to no more than those amounts.

¶23 The Supreme Court of Idaho followed this reasoning when it held:

> There is no dispute that Farm Bureau has notified the glass shops in advance of the rates it will pay for glass repair and replacement. Cascade had one of three options available to it

upon receiving Farm Bureau's notice: it could simply do the work and accept the amount Farm Bureau had stated it would pay; it could accept the insurance payment and collect the difference from the insured; or it could refuse to perform services for Farm Bureau insureds unless the customer paid it for the work, leaving the customer to seek reimbursement from Farm Bureau. It appears Cascade chose the first option. Cascade was unquestionably on notice of the amount Farm Bureau would pay and, nevertheless, proceeded with the work, knowing there was a limit on the amount it would receive. Farm Bureau paid the amount it had agreed to pay and has fulfilled its obligations under the policy.

*Cascade Auto Glass, Inc. v. Idaho Farm Bureau Ins. Co.*, 141 Idaho 660, 115 P.3d 751, 755 (2005). Although Cascade attempts to distinguish *Idaho Farm Bureau* because the Farm Bureau's policy expressly authorized the Bureau to unilaterally establish pricing, the attempt fails. Progressive can also modify its pricing terms unilaterally because the pricing agreement is terminable-at-will. Accordingly, in paying the revised amounts, Progressive has complied with its obligations under the pricing agreement.

■■■ ¶24 Moreover, Progressive did not breach its contracts with its insureds. The parties intended the original pricing agreement to set the "fair" amount Progressive contractually owed its insureds. Progressive also offered the updated terms as "fair and reasonable prices for the market." CP at 217-19. Cascade accepted the prices as "fair" when it performed work in exchange for the payment Progressive offered. When Progressive terminated the old pricing agreement and offered new terms, the resulting contracts could only be understood as also satisfying Progressive's obligation to its insureds to pay a reasonable amount for repairs.

¶25 A contrary interpretation would render the pricing agreement and modifications meaningless. If the proposed terms were intended as part payment with an unspecified amount still to be paid on each repair job, the contract would be illusory. A contract is illusory when its provisions make performance optional or discretionary. *Zuver v. Airtouch*

*Commc'ns, Inc.*, 153 Wn.2d 293, 317, 103 P.3d 753 (2004). If Cascade could accept the pricing terms without also agreeing that the terms satisfied Progressive's contractual obligation to pay a fair price, then Cascade's promise to accept the proposed prices in exchange for work performed would be optional. Cascade could refuse to accept payment on the grounds that it was not "fair" and thus elect whether to abide by the pricing agreement, rendering the agreement a nullity. But both parties clearly intended the pricing agreement to be binding, and courts construe contracts giving great weight to the parties' intent. *In re Estates of Wahl*, 99 Wn.2d 828, 830-31, 664 P.2d 1250 (1983). Here, it is evident that both parties intended the agreed terms to satisfy all the obligations between them, including Progressive's obligation to pay a "fair" price for repairs.

¶26 In conclusion, Cascade failed to raise an issue of material fact as to either of its claims. Progressive had the right to unilaterally terminate the original pricing agreement, and its superseding letters unequivocally did so. In addition, the letters constituted offers of new unilateral contracts. Cascade accepted Progressive's offers each time it performed glass work for a Progressive insured. Cascade was then entitled to payment on each job according to Progressive's offers. The trial court did not err in granting Progressive summary judgment.

¶27 Affirmed.

BRIDGEWATER and HUNT, JJ., concur.

Review denied at 161 Wn.2d 1012 (2007).