[No. 18365-0-II. Division Two. August 9, 1996.]

PETER SING, *Respondent*, v. JOHN L. SCOTT, INC., ET AL., *Appellants*.

58

*Douglas S. Tingvall* and *Jeanette M. Dalton*, for appellants.

*Stephen C. Willey, Jeffrey I. Tilden, Jeffrey M. Thomas,* and *Perkins Coie*, for respondent.

TURNER, J. — A jury found that John L. Scott, Inc., violated the Consumer Protection Act (CPA) and judgment was entered in favor of Sing, a prospective purchaser. On appeal, Scott claims that the evidence was insufficient to establish a CPA violation; its actions were exempt from the CPA; and the trial court erred in awarding attorney fees and in instructing the jury. We hold that Scott is not exempt from the CPA because the conduct of its agents was not specifically permitted by any statute. We also hold that there was sufficient evidence that Scott violated the CPA, and there was no instructional error. The trial court's adjustment of the attorney fees award for the contingent nature of the case was proper, but it erred in not segregating the fees associated with the CPA action from those associated with other claims. Accordingly, we affirm the jury verdict in favor of Sing, but remand the case for segregation of attorney fees.

## FACTS

This case stems from transactions between John L.

Scott, Inc., (Scott) a real estate brokerage, its real estate agents and Peter Sing, a real estate investor and prospective purchaser of real estate listed with Scott. Jody Prongay, Bob Pennock and Maureen Buckley are all licensed real estate agents for Scott, employed in the Bainbridge Island office.

In July 1987, the Rudds listed their undeveloped Bainbridge Island property with Scott through Jody Prongay. The listing price was $45,000. On August 16, 1989, Bob Pennock showed the Rudd property to Peter Sing, a real estate investor. Sing was interested in purchasing the property and indicated that he would pay full price, or more, to acquire it because if trees were cut, the property would have a view of Seattle. Pennock helped Sing prepare a purchase offer of $41,000. Sing's offer allowed himself 45 days after mutual acceptance to determine whether the property was suitable for his intended use.

On Friday, August 18, 1989, Pennock met with Jody Prongay and the Rudds to present Sing's offer to purchase the property. The Rudds made a written counteroffer that changed the purchase price to $45,000, increased the earnest money deposit, and shortened time limits on the closing period and on Sing's suitability determination. That evening, Pennock met with Sing to relay the Rudds' counteroffer. Sing indicated that he would accept the counteroffer, but because he was leaving for the weekend, he preferred to complete the paperwork on Sunday evening or Monday morning. According to Sing, Pennock conveyed no sense of urgency about signing. On August 19, 1989, Pennock told Prongay that Sing would be unavailable over the weekend but that he would accept the offer Sunday evening or Monday morning.

On August 20, 1989, Scott agent Maureen Buckley and her husband presented a written offer to purchase the Bainbridge Island property for $42,000. The Buckley offer contained shorter closing and suitability determination periods than the Sing offer.

The record is not clear whether Buckley had seen Sing's

offer. Apparently, Buckley and Prongay had known each other for many years and Prongay's desk was adjacent to Buckley's office. Prongay testified that she kept her listing file, which included the Sing offer, on her desk. At trial, Buckley stated that a couple of weeks before she made the offer to purchase, she looked for a plat map in Prongay's listing file but that it was not there. She asked Prongay if she had any maps and Prongay gave her one. Aside from this request, Buckley and Prongay say they did not talk about the Rudd property. Pennock also says he did not talk with the Buckleys about the property, or about the terms of the Rudd/Sing offer and counteroffer. Buckley was, nonetheless, informed that the Rudd real estate might be valuable view property.[1]

The Rudds preferred the Buckley offer because it provided less time for a suitability determination and less delay before closing. But they also wanted full price. Thus, they desired to make a counteroffer to the Buckleys.

Before the Rudds could do so, they had to find out if Sing had accepted their previous counteroffer. Accordingly, Prongay called Pennock, who stated that Sing had not come back into town and had not yet signed the counteroffer. Prongay then informed Pennock that the Rudds were withdrawing their counteroffer and instructed Pennock to notify Sing as soon as possible.[2] Pennock called Sing's home and left a message that the counteroffer had been withdrawn. The Rudds then made a counteroffer of $45,000 that the Buckleys accepted.

The sale closed in September 1989. In February 1990, the Buckleys resold the property for $137,500. At the time of trial, the tax assessor's records indicated that the property's value was approximately $182,520.

---

[1]Sing testified that he recently bought a similar view property through Ms. Buckley. He said that when they met on site just "a couple of weeks before this happened" he had explained to her that these were view properties; and that "if you clear some trees, then you can see Seattle. This is the best . . . investment."

[2]Because Sing had not yet accepted the counteroffer, the Rudds were free to withdraw it.

Sing sued Scott and the Buckleys, alleging intentional interference with a contract of business expectancy, misrepresentation, and violation of the Consumer Protection Act (CPA). At the commencement of trial, Sing voluntarily dismissed his misrepresentation claim. The remaining claims were tried before a jury, which found by special verdict that: (1) Sing did not have a valid contractual relationship or business expectancy with the probability of future economic benefit; (2) Scott violated the CPA; and (3) Maureen Buckley did not violate the CPA. The jury found that Scott's conduct proximately caused damages to Sing in the amount of $25,000.

Subsequently, the trial court denied Scott's motion for judgment as a matter of law, entered judgment on the verdict, and awarded an additional $7,500 in treble damages, plus $50,863.50 in attorney fees and $122.60 in costs. Scott appealed.

## ANALYSIS

### Consumer Protection Act Cause of Action

Scott claims that the trial court should have granted its motion for judgment as a matter of law because Sing failed to establish the elements of a CPA action, and because its conduct was exempt from the CPA, RCW 19.86.170. We disagree.

■ In reviewing a trial court's denial of a motion for judgment as a matter of law, the appellate court applies the same standard as the trial court.[3] A motion for judgment as a matter of law should not be granted unless, viewing the evidence in the light most favorable to the nonmoving party, the court can say that there is neither evidence, nor a reasonable inference therefrom, sufficient to sustain the verdict.[4] "If there is any justifiable evidence

---

[3]*Industrial Indem. Co. of the NW, Inc. v. Kallevig*, 114 Wn.2d 907, 915, 792 P.2d 520, 7 A.L.R.5th 1014 (1990).

[4]*See, e.g., Hojem v. Kelly*, 93 Wn.2d 143, 145, 606 P.2d 275 (1980).

upon which reasonable minds might reach conclusions that sustain the verdict, the question is for the jury."[5]

We conclude that, viewing the evidence in a light most favorable to Sing, there was sufficient evidence and reasonable inferences therefrom to sustain a verdict for Sing on his CPA cause of action.

■ To establish a violation of the CPA, a plaintiff must establish five elements: (1) an unfair or deceptive act or practice; (2) occurring within trade or business; (3) affecting the public interest; (4) injuring the plaintiff's business or property; and (5) a causal relation between the deceptive act and the resulting injury.[6] Scott argues that Sing failed to establish prongs (1), (3), and (4) of the above test. Whether a particular action violates the CPA is reviewable as a question of law.[7] We address each of the three elements that Scott challenges.

### A. Unfair or Deceptive Act or Practice

■ Although the CPA does not define an unfair or deceptive act or practice,[8] Washington cases provide that an act may be unfair or deceptive if it "has the capacity to deceive a substantial portion of the public."[9] Even a misrepresentation made to only one person can have the capacity to deceive many where, for instance, such repre-

---

[5]*McGreevy v. Oregon Mutual Ins. Co.*, 74 Wn. App. 858, 866, 876 P.2d 463 (1994), *aff'd*, 128 Wn.2d 26 (1995).

[6]*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780, 719 P.2d 531 (1986); *see also Henery v. Robinson*, 67 Wn. App. 277, 289, 834 P.2d 1091 (1992), *review denied*, 120 Wn.2d 1024 (1993). The elements enunciated in *Hangman Ridge*, merely refined past decisional law as laid out in *Anhold v. Daniels*, 94 Wn.2d 40, 45, 614 P.2d 184 (1980). *Aubrey's R.V. Center, Inc. v. Tandy Corp.*, 46 Wn. App. 595, 609, 731 P.2d 1124 (1987) (retroactively applying the *Hangman Ridge* test).

[7]*Sign-O-Lite Signs, Inc. v. DeLaurenti Florists, Inc.*, 64 Wn. App. 553, 560, 825 P.2d 714, *review denied*, 120 Wn.2d 1002 (1992); *Keyes v. Bollinger*, 31 Wn. App. 286, 289, 640 P.2d 1077 (1982).

[8]*Aubrey's R.V. Center*, 46 Wn. App. at 609.

[9]*See, e.g., Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 592, 675 P.2d 193 (1983); *Sign-O-Lite*, 64 Wn. App. at 561; *Aubrey's R.V. Center*, 46 Wn. App. at 609.

sentation is made in a standard form contract or to a sales representative who will subsequently communicate the misrepresentation to many potential buyers.[10]

 In the present case, there is evidence from which the jury could conclude that Scott engaged in an unfair or deceptive act or practice. The crux of Sing's argument is that it is unfair and deceptive for a real estate agency to (1) allow its brokers access to files containing third party purchase offers listed with the agency, and then (2) allow that broker to compete for the purchase of the property with knowledge of another prospective buyer's offer.[11]

Here, Buckley had access to Prongay's listing file and looked in it two weeks before she made the offer. From the following evidence, a jury could infer that Buckley used information from the listing file to gain an unfair advantage over Sing. Sing testified that he had purchased similar view property through Buckley and had told her that with trees cut, such properties have a view of Seattle and are the "best investment." Although the property at issue had been listed with Scott for over two years, just two days after Sing's offer was presented, Buckley presented an offer for slightly more money on terms more in line with those contained in the Rudds' counteroffer to Sing. The jury could infer (1) that Buckley had access to the listing file for the Rudd property, (2) that Buckley had seen the Sing offer, and (3) that Buckley had an unfair advantage over Sing because she could craft her offer so it was slightly more appealing than Sing's offer. Scott has no policy prohibiting agents from viewing offers on properties listed with the agency or from using such information to

---

[10]*See, e.g., Henery*, 67 Wn. App. at 291; *Sign-O-Lite*, 64 Wn. App. at 562 (court found an unfair and deceptive act or practice where a sales representative, who made "cold calls", misrepresented the document the purchaser was asked to sign, as well as certain portions of the contract).

[11]John L. Scott misunderstands Sing's arguments to be (1) the presentation of the Buckley's offer to the Rudds is an unfair and deceptive practice and (2) a real estate broker should be prohibited from making an offer to purchase property when an unlicensed member of the general public is negotiating for purchase such property.

compete for the purchase of the property. This could be considered an unfair or deceptive practice to the extent that offers by third parties are intended to be confidential.[12] Moreover, because Scott solicits sellers and purchasers routinely, its practice of allowing access to listing files may have the requisite capacity to deceive a substantial portion of the public. The jury had sufficient evidence from which it could conclude that Scott engaged in an unfair or deceptive act or practice.

### B. Affecting the Public Interest

The parties dispute whether Scott's conduct affects the public interest. "[W]hether the public has an interest in any given action is to be determined by the trier of fact from several factors, depending upon the context in which the alleged acts were committed."[13]

■ Here, the transaction between Sing and Scott was a private transaction.[14] "[I]t is the likelihood that additional plaintiffs have been or will be injured in exactly the same fashion that changes a factual pattern from a private dispute to one that affects the public interest."[15] In the context of a private transaction, four nonexclusive factors

---

[12]The cases from other jurisdictions cited by John L. Scott for the proposition that its agents' conduct was proper are not persuasive. These cases do not deal with violations of consumer protection legislation. They address other legal theories not at issue in this appeal. *See Walter v. Murphy*, 573 N.E.2d 678 (Ohio Ct. App. 1988) (tortious interference with contractual relationship); *Weissman v. Mertz*, 128 A.D.2d 609 (N.Y. App. Div. 1987) (breach of fiduciary duty, fraud, conspiracy to injury plaintiff's contractual rights); *Secan v. Dunbar*, 679 P.2d 526 (Ariz. Ct. App. 1983) (breach of fiduciary duty); *Carroll v. Action Enter., Inc.*, 292 N.W.2d 34 (Neb. 1980) (negligence in presentation of offer to seller; breach of fiduciary duty).

[13]*Hangman Ridge*, 105 Wn.2d at 789-90.

[14]Apparently the trial court perceived the transaction to be a private dispute as it instructed the jury on the factors relevant to finding a public interest in a private transaction. Scott has not assigned error to this instruction and thus the factors applicable in the context of a private dispute are the law of the case. *See Tilton v. Cowles Pub Co.*, 76 Wn.2d 707, 720, 459 P.2d 8 (1969), *cert. denied*, 399 U.S. 927 (1970)(instructions not excepted to become the law of the case).

[15]*Hangman Ridge*, 105 Wn.2d at 790.

are deemed relevant to establishing the requisite public interest:

> (1) Were the alleged acts committed in the course of defendant's business? (2) Did defendant advertise to the public in general? (3) Did defendant actively solicit this particular plaintiff, indicating potential solicitation of others? (4) Did plaintiff and defendant occupy unequal bargaining positions?[16]

No single factor is dispositive, nor is it necessary that all be present.

Sing produced sufficient evidence that Scott's practices affected the public interest. It can be inferred that the Buckleys' access to Rudd's listing file and possible use of the information contained therein occurred in the course of Scott's business. Additionally, Scott is a large real estate brokerage that advertises its services through various media. Through such advertising, Scott actively solicits sellers and buyers of residential properties. Scott has no established protocol for competition between its brokers and outside purchasers. It is likely, therefore, that others could be injured in the same fashion as was Sing.

## C. Injury to Business or Property

■ Another element of a CPA action is proof of an injury to the claimant's business or property.[17] The injury need not be great. As the court noted in *Mason v. Mortgage Am., Inc.,*[18] "[t]he injury element will be met if the consumer's property interest or money is diminished because of the unlawful conduct." Even nonquantifiable injuries, such as loss of goodwill, suffice to establish the injury element of the *Hangman Ridge* test.[19]

Scott argues that the only injury Sing proved at trial

---

[16]*Hangman Ridge*, 105 Wn.2d at 790-91.

[17]*Hangman Ridge*, 105 Wn.2d at 792.

[18]114 Wn.2d 842, 854, 792 P.2d 142 (1990).

[19]*Nordstrom, Inc. v. Tampourlos*, 107 Wn.2d 735, 740, 733 P.2d 208 (1987).

was lost profits, that lost profits are not compensable under the CPA, and, therefore, that Sing failed to establish the requisite injury to business or property. Scott, however, cites no persuasive authority for the proposition that lost profits are not compensable under the CPA.[20]

We hold that lost profits or loss of the appreciation in real property suffices to prove injury to a real estate investor's business. Case law indicates that the quantum of injury need not be great. Furthermore, in *Sign-O-Lite* the Court of Appeals has impliedly recognized that lost profits (or the cost to one's business) suffice for the injury element of a CPA action.[21] Additionally, compensatory damages for what a party would have received had the unfair or deceptive act not occurred are common in CPA actions. In *Bowers*,[22] for instance, the sellers of property did not obtain a security interest because their escrow agent failed to advise them to get legal representation. They brought a CPA action against the escrow agent. The court held the proper measure of the seller's damages to be the value of the security interest of which they were deprived.[23]

Sing, a real estate investor, sought recovery for injury to his business—the loss of appreciation in the property he wanted to purchase. He introduced evidence of the current market value of the property and the market value

---

[20]John L. Scott cites only to *Wilkinson v. Smith*, 31 Wn. App. 1, 14, 639 P.2d 768, *review denied*, 97 Wn.2d 1023 (1982). In *Wilkinson*, after explaining that the plaintiff could not both rescind the contract and claim damages under the contract such as lost profits, the court stated, "[a]dditionally, the Consumer Protection Act does not provide for the discretionary award of damages for loss of profit or mental distress." This statement in *Wilkinson* is dicta, which we do not find persuasive.

[21]In *Sign-O-Lite* the court ruled that injury to the purchaser's business could be inferred from: (1) her inability to tend her store as she would have without Sign-O-Lite's actions; (2) her spending three hours per month dealing with Sign-O-Lite matters; and (3) her being self-employed and the sole owner of her business. That the injury was not quantifiable was of no consequence. *Sign-O-Lite*, 64 Wn. App. at 564.

[22]100 Wn.2d 581.

[23]*Bowers*, 100 Wn.2d at 593.

from when the Buckleys sold the property. By comparing those values to the contract price, he produced sufficient evidence of injury to his business or property to meet this element of a CPA cause of action.[24]

In sum, Sing presented sufficient evidence of an unfair or deceptive act or practice, affecting the public interest, which caused injury to his business. This evidence was sufficient to sustain a verdict in favor of Sing on his CPA action. Thus, the trial court properly denied Scott's motion for judgment as a matter of law on the CPA action.

## D. Conduct Not Exempt

■ Scott also suggests the conduct of its agents was exempt from the CPA. RCW 19.86.170 exempts "actions or transactions specifically permitted within the statutory authority granted to any regulatory board or commission established within Title 18 RCW."

Scott points to Department of Licensing regulations, which require the speedy presentation of all offers to the seller, and argues that Prongay's presentation of the Buckleys' offer is specifically permitted and is therefore exempt from the CPA. Although Prongay's presentation of the offer may be exempt from the CPA,[25] Scott agents engaged in other conduct that is not specifically permitted by the Department of Licensing. Sing contends that the following constitute unfair or deceptive acts or practices: (1) allowing agents to obtain access to listing files containing other offers and thereby gain an advantage as purchasers; (2) failing to communicate to the seller that a prospective purchaser would pay more than the listed price; and (3) failing to advise a prospective purchaser that time was of

[24]The jury's finding that Sing had no valid contractual relationship or business expectancy with the probability of future economic benefit disposed of Sing's contract claim only. The jury also found that Scott violated the CPA. The jury's finding on the contract claim is not inconsistent with the conclusion that Sing's business was injured.

[25]Even Sing concedes that Buckleys' making of the offer and the presentation of it are not problematic.

the essence in accepting a counteroffer.[26] The above conduct is not specifically permitted by the Department or any other agency or commission and thus is not exempt from the CPA.

▌▌ Scott also relies on the Department of Licensing's conclusion that it was not improper for the Buckleys to make their offer before Sing accepted or rejected the counteroffer. The Department's conclusion, however, does not constitute "specific permission" for real estate licensees to make offers on properties listed with their own agency.[27] To avail oneself of the "specific permission" exemption under RCW 19.86.170, one "must prove that the activity was authorized by statute and that acting within this authority the agency took overt, affirmative actions specifically to permit the actions or transactions engaged in."[28] "Mere nonaction by a regulatory board or commission . . . to actions taken by members of a business, occupation or profession does not amount to specific permission."[29] Our courts emphasize that the exemption

---

[26]Sing also argues that John L. Scott engaged in unfair and deceptive practices because: (1) it violated its duty to obtain for the Rudds the highest price available; (2) it failed to inform the Rudds that Sing would have paid more than the listing price; and (3) it failed to advise the Rudds to present simultaneous counteroffers at a higher price when there were competing purchasers. However, because these alleged violations of the CPA would injure the Rudds and not Sing, they cannot serve as the basis for Sing's CPA action.

[27]Scott also appeals the trial court's exclusion of the Department of Licensing's determination that Scott's conduct did not violate any real estate licensing laws. We hold that the trial court did not abuse its discretion in excluding this evidence because the determination was of questionable relevance and it is likely that any potential relevance was outweighed by the danger that the jury would place undue weight on such evidence. *See* 5 KARL B. TEGLAND, WASHINGTON PRACTICE § 106 p. 356 (1989) ("The dangers of confusion and overvaluation have led the courts to exclude many other kinds of evidence, including evidence that may be unduly impressive because it sounds official."); *see also Cantu v. City of Seattle*, 51 Wn. App. 95, 752 P.2d 390 (1988) (Equal Employment Opportunity Commission determination held inadmissible).

[28]*In re Real Estate Brokerage Antitrust Litig.*, 95 Wn.2d 297, 301, 622 P.2d 1185 (1980).

[29]*Antitrust Litig.*, 95 Wn.2d at 301; *see also Vogt v. Seattle-First Nat. Bank*, 117 Wn.2d 541, 552, 817 P.2d 1364 (1991).

must be narrowly construed so to comply with the CPA's purpose.[30]

In the present case, there is no statute authorizing agents of a real estate agency to make offers on properties listed by the agency or authorizing access for agents to offers of outside parties on such properties. Moreover, the Department's conclusion that no real estate licensing law was violated does not constitute specific permission to engage in the acts Sing alleges are unfair and deceptive. Because CPA exemptions must be narrowly construed, we conclude that Scott failed to establish the requisite overt and affirmative sanctioning of its conduct by the Department. Scott's conduct was not exempt from the CPA, and the trial court properly denied the motion for judgment as a matter of law.

## Treble Damages

Scott argues that the trial court erred in awarding treble damages to Sing because lost profits do not constitute actual damages under the CPA. We reject this argument as well.

RCW 19.86.090 states that the court may increase the award of damages to three times the actual damages sustained, not to exceed ten thousand dollars in increased damages. Failure to show actual monetary damages precludes the recovery of treble damages under the CPA.[31]

The term "actual damages" merely refers to "[c]ompensation for actual injuries or loss" and it is "synonymous with compensatory damages."[32] Actual damages are distinguishable from damages which are nominal, ex-

---

[30]*Vogt*, 117 Wn.2d at 552.

[31]*See, e.g., Mason*, 114 Wn.2d at 855; *St. Paul Fire & Marine Ins. Co. v. Updegrave*, 33 Wn. App. 653, 660, 656 P.2d 1130, 35 A.L.R.4th 1 (1983).

[32]BLACK'S LAW DICTIONARY 712 (6th ed. 1991); *see also Rasor v. Retail Credit Co.*, 87 Wn.2d 516, 530 n.3, 554 P.2d 1041 (1976).

emplary or punitive.[33] In the present case, the jury awarded Sing $25,000 for harm proximately caused to him by Scott's conduct. These are compensatory damages and constitute the "actual damages" upon which an award of treble damages can be made. Accordingly, it was proper for the trial court to award Sing the $7,500 in treble damages. Moreover, the trial court's award of treble damages serves some of the purposes behind the treble damage provision: (1) financial rehabilitation of the injured consumer, (2) encouraging private citizens to bring actions benefiting the public, (3) deterrence, and (4) punishment.[34] As Sing points out, such an award may encourage Scott to develop a protocol to deal with these potential conflicts in the future. We affirm the treble damages award.

## Attorney Fee Award

Scott challenges the attorney fee award in two respects; it claims the trial court erred in (1) failing to segregate time spent on unsuccessful legal theories from time preparing the CPA cause of action and (2) in applying a risk factor adjustment for the contingent nature of the case. We agree that the trial court erred in failing to segregate the attorney fees.

The Washington Supreme Court summarized the two-step process courts use to calculate attorney fees available to a successful CPA claimant:

> Attorneys' fees . . . under RCW 19.86.090 are calculated as follows: (1) establishing a "lodestar" fee by multiplying a reasonable hourly rate by the number of hours reasonably expended on theories necessary to establish the elements of a Consumer Protection Act cause of action; and (2) adjusting that lodestar up or down based upon the contingent nature of success (risk) and, in exceptional circumstances, based also on

---

[33]BLACK'S LAW DICTIONARY 35 (6th ed. 1991).

[34]*See* Brian J. Linn & Gretchen Newman, Comment *Reasonable Attorneys Fees and Treble Damages—Balancing the Scales of Consumer Justice*, 10 GONZ. L. REV. 593, 609 (1975); *Updegrave*, 33 Wn. App. at 658; *Keyes*, 31 Wn. App. at 297 n.2.

the quality of work performed. The burden of justifying any deviation from the lodestar rests on the party proposing such an alteration.[35]

To determine the hours reasonably expended in litigation, the court must discount hours spent on unsuccessful claims, duplicated effort, or otherwise unproductive time.[36]

 Whether attorney fees are reasonable is a question of fact and the trial court is accorded broad discretion in fixing their amount.[37] A trial court's attorney fee award will be overturned only for manifest abuse of discretion.[38]

 RCW 19.86.090 provides that any person who is injured in his or her business or property by a CPA violation "may bring a civil action . . . to recover the actual damages sustained by him or her, or both, together with the costs of the suit, including a reasonable attorney's fee." Fees awarded pursuant to the CPA, however, "should only represent the reasonable amount of time and effort expended which should have been expended for the actions of [the defendant] which constituted a Consumer Protection Act violation."[39] Numerous Washington cases discuss the necessity of segregating the services pertaining to the CPA action from those pertaining to other legal issues.[40] This practice comports with the general rule that attorney fees may be awarded only when authorized by a

[35]*Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 334, 858 P.2d 1054 (1993) (citations omitted).

[36]*Bowers*, 100 Wn.2d at 597.

[37]*Fisons*, 122 Wn.2d at 335; *Schmidt v. Cornerstone Investments, Inc.*, 115 Wn.2d 148, 169, 795 P.2d 1143 (1990).

[38]*Bowers*, 100 Wn.2d at 595.

[39]*Nordstrom*, 107 Wn.2d at 744 (where a number of issues besides the CPA violation are litigated at trial, it would give the CPA claimant an unfair benefit to award it attorney fees for aspects of the suit not related to CPA violations).

[40]*Schmidt*, 115 Wn.2d at 170-71 (plaintiffs not entitled to an award of attorneys fees in a CPA appeal where total requested includes attorney time for the entire appeal, which consisted of approximately 13 issues not related to the CPA claims); *Sign-O-Lite*, 64 Wn. App. at 566 ("[t]ime spent developing theories essential to the CPA claim must be segregated from time spent on legal theories relating to other causes of action"); *See also Styrk v. Cornerstone Investments,*

private agreement, a statute or a recognized ground of equity.[41]

Sing argues that the "conduct" supporting the CPA claim and his other claims is the same and impossible to segregate. Our Supreme Court in *Travis v. Washington Horse Breeders Ass'n, Inc.*,[42] rejected such an argument. It ruled that a trial court's attorney fee award was erroneous because some of the fee award related to non-CPA claims. The fact that the claims "overlapped and were intertwined" and that each cause of action had some basic facts in common did not justify an aggregate attorney fees award. The *Travis* court noted:

> While a number of fundamental facts are essential to every aspect of the lawsuit, the law pertaining to warranties, a CPA violation, and mutual mistake is not the same. . . . [W]hile there may be an interrelationship as to the basic facts, the legal theories which attach to the facts are different.[43]

"[T]he court must separate the time spent on those theories essential to the CPA and the time spent on legal theories relating to the other causes of action."[44] The attorney fee award was remanded for further consideration by the trial court.

The fee statements submitted by Sing's lawyer contained numerous general entries that could pertain to both the CPA claim and the tort claim. Those fees are properly awarded only if no reasonable means exist for segregating

---

*Inc.*, 61 Wn. App. 463, 472-74, 810 P.2d 1366, *review denied*, 117 Wn.2d 1020 (1991); *Nuttall v. Dowell*, 31 Wn. App. 98, 114, 639 P.2d 832, *review denied*, 97 Wn.2d 1015 (1982).

[41]*See, e.g., Fisher Properties, Inc. v. Arden-Mayfair, Inc.*, 106 Wn.2d 826, 849-50, 726 P.2d 8 (1986).

[42]111 Wn.2d 396, 410, 759 P.2d 418 (1988).

[43]*Travis*, 111 Wn.2d at 411.

[44]*Travis*, 111 Wn.2d at 411.

the non-recoverable costs from the recoverable costs.[45] A number of billing entries specifically identify work done on one claim or another. The trial court could have reasonably deducted at least those fees associated solely with the tort claim. We hold that the trial court abused its discretion by failing to segregate the attorney fees incurred in prosecuting the CPA action from those incurred in preparing other legal claims.[46] We remand this case for proper segregation of services attributable to the CPA claim and for a recalculation of the attorney fee award.

We also conclude, however, that the trial court's application of a risk factor adjustment of 1.5 times the actual attorney fees was proper and should be preserved when the trial court recalculates Sing's attorney fees. Washington courts recognize the propriety of adjusting actual fees for the contingent nature of success. The contingency adjustment promotes the goal of ensuring representation for clients with risky cases.[47]

The *Bowers* court provided some guidelines for determining the multiplier for a contingency adjustment:

> In adjusting the lodestar to account for this risk factor, the trial court must assess the likelihood of success at the outset of the litigation. . . . Most important, "the contingency adjustment is designed solely to compensate for the possibility . . . that the litigation would be unsuccessful and that no fee would be obtained."[48]

Accordingly, the risk factor should be applied only where the payment of attorney fees is not assured. Here, recovery

---

[45]*Broten v. May*, 49 Wn. App. 564, 573, 744 P.2d 1085 (1987), *review denied*, 110 Wn.2d 1003 (1988).

[46]While the trial court properly reduced the fee award for the presence of a second attorney during trial, it declined to segregate the services and fees associated with non-CPA causes of action.

[47]*See, e.g., Bowers*, 100 Wn.2d at 598.

[48]*Bowers*, 100 Wn.2d at 598-99 (quoting *Copeland v. Marshall*, 641 F.2d 880, 893 (D.C. Cir. 1980)).

for the attorneys was contingent on the success of Sing's CPA action. This was an appropriate case in which to apply a contingency adjustment.[49] Accordingly, we affirm the trial court's application of a 1.5 multiplier for the contingent nature of Sing's case.

■ We also grant Sing's request for an award of attorney fees incurred on appeal. Attorney fees in connection with CPA claims are recoverable on appeal.[50] Because this appeal relates only to the CPA action, an attorney fees award is appropriate. On remand, the trial court should also determine the amount of reasonable attorney fees incurred on appeal.[51]

## Jury Instructions

Finally, Scott assigns error to the trial court's refusal to give a proposed instruction. The proposed instruction stated, in part: "If you find for the plaintiff, your verdict should reflect the difference between the fair market value of the property at the time of the plaintiff's offer and the purchase price under the earnest money agreement." Instead, the court instructed the jury: (1) to "determine the amount of money which will reasonably and fairly compensate the plaintiff for such damages as you find were proximately caused by the defendants' conduct," and (2) on his CPA claim, "plaintiff is entitled to recover the pecuniary loss resulting proximately from the unfair or deceptive acts of Defendant John L. Scott, Inc." Scott argues that the court's instruction precluded it from arguing that Sing's "pecuniary loss" should be measured by

---

[49]*See Fisons*, 122 Wn.2d at 334-36 (1.5 multiplier appropriate where case was partially contingent).

[50]*Fisons*, 122 Wn.2d at 336; *Bowers*, 100 Wn.2d at 602.

[51]*See Fisons*, 122 Wn.2d at 336.

the difference between the market value of the property and the price he would have paid.[52]

■ We review the refusal to give a requested jury instruction for abuse of discretion.[53] A party is entitled to a proposed instruction only if it accurately states the law.[54] Instructions are sufficient if they permit each party to argue its theory of the case, are not misleading and, when read as a whole, properly inform the trier of fact of the applicable law.[55]

We hold that the trial court did not abuse its discretion in refusing to give Scott's proposed instruction. Scott offers no legal support for its contention that Sing's damages should have been measured only by the difference between the market value and the contract price.

Moreover, the proposed instruction did not accurately state the law. The CPA allows a party injured by the unfair or deceptive acts of another to recover "the actual damages sustained by him or her." RCW 19.86.090. The trial court's damage instruction comported with Washington law on compensatory damages, also known as "actual damages," and reflected the CPA and cases discussing damages thereunder.[56] We hold that the trial court did not commit instructional error.

In conclusion, we affirm the denial of the motion for judgment as a matter of law. We remand this case for a segregation of attorney fees attributable solely to the CPA

---

[52]For support for this argument John L. Scott cites *Forbus v. City Realty, Inc.*, Case No. 90-131 (Cir. Ct. Ala. 1992) where the court held that the measure of the disappointed purchaser's damages was the difference between the market value of the property and the price for which they offered to purchase the property. This case is not controlling and can be distinguished because, unlike the disappointed purchaser in *Forbus*, Sing sought to purchase the property so that he could improve it and sell it for a profit.

[53]*Savage v. State*, 72 Wn. App. 483, 492, 864 P.2d 1009 (1994), *aff'd in part, rev'd in part on other grounds*, 127 Wn.2d 434 (1995).

[54]*See Thogerson v. Heiner*, 66 Wn. App. 466, 474, 832 P.2d 508 (1992).

[55]*Thogerson*, 66 Wn. App. at 473.

[56]*See* WPI 3d § 30.01; RCW 19.86.090; *Keyes*, 31 Wn. App. at 296 (holding "pecuniary loss" is compensable under the CPA).

claim and recalculation of the attorney fees award. We also order the trial court to determine and award Sing his reasonable attorney fees on appeal.

MORGAN and BRIDGEWATER, JJ., concur.

Reconsideration denied September 25, 1996.

Review granted at 131 Wn.2d 1008 (1997).