24

[No. 64715-1. En Banc.]
Argued June 17, 1997.     Decided December 24, 1997.
PETER SING, *Respondent,* v. JOHN L. SCOTT, INC., ET AL., *Petitioners.*

26

*Jeannette M. Dalton* and *Douglas S. Tingvall*, for petitioners.

*Gordon, Murray & Tilden*, by *Jeffrey I. Tilden* and *Jeffrey M. Thomas*; and *Perkins Coie*, by *Stephen C. Willey* and *Michael H. Himes*, for respondent.

MADSEN, J. — This case arises from transactions between John L. Scott (Scott), a real estate brokerage, its real estate agents, and Peter Sing, a real estate investor and prospective purchaser of real estate listed with Scott. Sing alleged that Scott violated the Consumer Protection Act and a jury found in Sing's favor. Scott appeals a published Court of Appeals decision affirming the trial court's denial of Scott's motion for judgment as a matter of law. We reverse the decision of the Court of Appeals.

STATEMENT OF THE CASE

In July 1987, the Rudds listed their undeveloped Bainbridge Island property with John L. Scott through real estate agent, Jody Prongay. The listing price was $45,000. During the two years which the property was listed, the Rudds had entered into earnest money agreements with four different purchasers, each of whom backed out of the

transaction on the basis of feasibility study contingencies contained in the earnest money agreements. Consequently, Prongay stated the Rudds were frustrated with the feasibility study contingency process.

On August 14, 1989, Bob Pennock, a real estate agent for Scott, showed the Rudd property to Peter Sing, a real estate investor. Sing was interested in purchasing the Rudd property and told Pennock he would pay full price, or more, because if trees were cut the property would have a view of Seattle.

Pennock helped Sing create an offer to purchase the property. Sing offered $41,000 with a $500 earnest money agreement and a 45-day contingency period to determine whether the property was suitable for development. On Friday, August 18, Pennock met with Jody Prongay and the Rudds to present Sing's offer to purchase the property. Prongay prepared a written counteroffer asking for the full purchase price of $45,000, $2,000 earnest money, and a 21-day feasibility study period. The Rudds also wanted to move the closing date from November 30 to August 1.

Later that evening, Pennock took the counteroffer over to Sing. Sing stated that he would sign the counteroffer, but because he was going out of town for the weekend, he preferred to sign the counteroffer on Sunday evening when he returned or on Monday morning. Pennock testified that Sing wanted to wait because it would give him more time on the investigation and feasibility study contingency, since the time limit begins when the agreement is signed by both parties. On Saturday, August 19, Pennock left a written message for Prongay that Sing was out of town for the weekend but that he would "probably" accept the Rudds' counteroffer Sunday night or Monday morning when he returned. Verbatim Report of Proceedings at 199.

The next day, Sunday, August 20, Scott agent, Maureen Buckley and her husband, Edward, presented a written offer to purchase the Rudd property. They offered $42,000, $500 earnest money, an 11-day feasibility study period and a shorter closing period than Sing's offer.

Prongay testified that the Rudds preferred the Buckley's offer because of the shorter feasibility study period and closing time. However, they still wanted full price and, thus, decided to make a counteroffer. Before the Rudds could make their counteroffer to the Buckleys they had to find out if Sing had accepted their previous counteroffer. Accordingly, Prongay called Pennock, who stated that Sing had not come back into town and had not yet signed the counteroffer. Prongay then informed Pennock that the Rudds were withdrawing their counteroffer and instructed him to notify Sing as soon as possible. Pennock called Sing's home and left a message that the counteroffer had been withdrawn. The Rudds then made a counteroffer of $45,000 that the Buckleys accepted. That evening, at about 7:30, Prongay called Pennock to tell him someone else had purchased the property.

Jody Prongay and Maureen Buckley had known and worked together for many years and Prongay's desk was adjacent to Buckley's office. Direct evidence was not presented that Buckley used Sing's offer to gain an advantage in the transaction. However, Prongay testified that she kept her listing file on her desk and Buckley testified that a couple weeks before she made the offer to purchase the Rudd property, which was also before Sing made his offer, she looked for a plat map of the property in Prongay's listing file but could not find it. She asked Prongay if she had any maps and Prongay gave her one. Aside from this request, Prongay and Buckley testified they did not discuss the Rudd property, nor did they discuss the terms of the offer and counteroffer between the Rudds and the Sings. Nonetheless, Buckley was aware of the value of potential view properties.[1]

The sale closed in September, 1989. In February, 1990, the Buckleys resold the property for $137,500. At the time

---

[1]Just a few weeks prior to the eventual sale of the Rudd property, Buckley had sold property to Sing. On a tour of the property, Sing told Buckley that with the increasing prices of waterfront property, hilltop properties would become increasingly valuable, especially where trees could be cleared to provide views.

of trial, the tax assessor's records estimated the property's value at $182,520.

Sing sued Scott and the Buckleys, alleging intentional interference with a contract of business expectancy, misrepresentation and violation of the Consumer Protection Act (CPA). At the beginning of trial Sing abandoned the misrepresentation claim. The remainder of the claims were tried before a jury which found by special verdict that: (1) Sing did not have a valid contractual relationship of business expectancy with the probability of future economic benefit; (2) Scott violated the CPA; and (3) Maureen Buckley did not violate the CPA. The jury found Scott caused damages to Sing and awarded him $25,000. Thereafter, Scott's motion for judgment as a matter of law was denied by the trial judge and judgment was entered against Scott. Sing was awarded an additional $7,500 in treble damages, $50,863.59 in attorneys' fees and $122.60 in costs.

The Court of Appeals, in a published opinion, affirmed the trial court's judgment, except as to attorneys' fees and denied Scott's motion for reconsideration. *See Sing v. John L. Scott, Inc.*, 83 Wn. App. 55, 920 P.2d 589 (1996). Scott petitioned this court for review and it was granted.

## DISCUSSION

■■ When reviewing a trial court's decision to deny a motion for judgment as a matter of law the appellate court applies the same standard as the trial court. Granting a motion for judgment as a matter of law is appropriate when, viewing the evidence most favorable to the nonmoving party, the court can say, as a matter of law, there is no substantial evidence or reasonable inference to sustain a verdict for the nonmoving party. *Industrial Indem. Co. of the NW, Inc. v. Kallevig*, 114 Wn.2d 907, 915-16, 792 P.2d 520, 7 A.L.R.5TH 1014 (1990); *Boeing Co. v. Sierracin Corp.*, 108 Wn.2d 38, 67, 738 P.2d 665 (1987).

Although the court must draw all favorable inferences that may be reasonably evinced in favor of the nonmoving party, *see Douglas v. Freeman,* 117 Wn.2d 242, 246, 814

P.2d 1160 (1991), the question of whether a particular conduct gives rise to a CPA violation is reviewable as a question of law. *Estate of Hall v. HAPO Fed. Credit Union*, 73 Wn. App. 359, 365, 869 P.2d 116 (1994); *Sign-O-Lite Signs, Inc. v. DeLaurenti Florists, Inc.*, 64 Wn. App. 553, 560, 825 P.2d 714 (1992); *Keyes v. Bollinger*, 31 Wn. App. 286, 289, 640 P.2d 1077 (1982).

Washington's Consumer Protection Act provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." RCW 19.86.020. The purpose of the CPA is "to protect the public and foster fair and honest competition." RCW 19.86.920. To establish a claim under the CPA five elements must be proven: (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) public interest impact, (4) injury to plaintiff in his or her business or property and (5) causation. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 784, 719 P.2d 531 (1986).

Scott argues the first element, an unfair or deceptive act or practice, has not been established in this case and we agree. To show a party has engaged in an unfair or deceptive act or practice a "plaintiff need not show that the act in question was intended to deceive, but that the alleged act had the capacity to deceive a substantial portion of the public."[2] *Hangman*, 105 Wn.2d at 785 (emphasis omitted). The purpose of the capacity-to-deceive test is to deter deceptive conduct before injury occurs. *Id.*

Sing makes two main arguments why Scott's actions, through its agents, were unfair and deceptive. First, Sing asserts it is unfair for Scott to allow its brokers access to files containing third party purchase offers listed with the agency, and then allow that broker to compete for the purchase of the property with knowledge of another prospective buyer's offer. Second, Sing argues that Scott had an obligation to obtain for the seller the best purchase

---

[2]The CPA does not define "unfair or deceptive act or practice."

price possible and that it failed to do so by not informing the Rudds that Sing was willing to pay the full price or more for the property. Thus, Sing contends, he was not allowed to fairly compete for the property.

In affirming the trial court's denial of Scott's motion as a matter of law, the Court of Appeals focused on the first of the two arguments made by Sing. Since the evidence showed that Buckley had access to Prongay's listing file and looked in it two weeks before she made the offer, the court stated that a jury could infer that Buckley used information from the listing file to gain an unfair advantage over Sing. *Sing*, 83 Wn. App. at 64. The court noted that although the property had been listed for over two years, just two days after Sing's offer was made, Buckley presented an offer for slightly more money on terms more in line with those contained in the Rudds' counteroffer to Sing. *Id.* Thus, the court found the jury could infer (1) that Buckley had access to the listing file for the Rudd property, (2) that Buckley had seen the Sing offer, and (3) that Buckley had an unfair advantage over Sing because she could craft her offer so it was slightly more appealing than Sing's offer. *Id.*

The court pointed out that Scott has no policy prohibiting agents from viewing offers on properties listed with the agency or from using such information to compete for the purchase of the property. *Id.* This, explained the court, "could be considered an unfair or deceptive practice to the extent that offers by third parties are intended to be confidential." *Id.* at 65.

Scott appeals the court's decision, disputing the conclusion that Scott had a duty to keep Sing's offer confidential. We agree. Even though Sing was a Scott customer, because John L. Scott was the listing agency, both Prongay and Pennock's primary fiduciary duty was at all times to the seller.[3] As such, they had a duty to obtain for the seller the best possible deal. *See Mersky v. Multiple Listing Bureau of*

---

[3]In 1996, the Legislature enacted comprehensive legislation which redefined the duties of real estate brokers. RCW 18.86. The statute provides that where dif-

*Olympia, Inc.*, 73 Wn.2d 225, 228-29, 437 P.2d 897 (1968). The listing agent may disclose information about an offer to a prospective purchaser to establish a higher price or better terms for the seller. It follows that Sing's offer to purchase the property could not be confidential. Consequently, the Court of Appeals has created a duty of confidentiality to the buyer which conflicts with the agent's fiduciary duties to the seller. Additionally, there is no statute prohibiting real estate agents from purchasing property listed with their own agency where another buyer has made an offer. Thus, the fact that the Buckleys may have had knowledge of Sing's offer before making their own offer does not constitute an unfair or deceptive act or practice.

Next, Sing argues that Scott failed to fulfill its fiduciary duties to the Rudds by not informing them that Sing would pay full price or more for the property. Sing states that Prongay did not attempt to use the two competing offers to maximize the selling price; that is, she did not attempt to create a "bidding war."

Prongay testified that when two or more offers exist on a property a common technique is to issue simultaneous counteroffers. In other words, when two eager purchasers exist for a property a "bidding war" may ensue. Although there were two eager buyer in this case, Sing states, there is no indication in the record that Prongay advised the Rudds of Sing's willingness pay full price or more for the property. Sing contends the Rudds were not aware of their opportunity to create a bidding war and potentially get a higher price for their property. Sing argues that Scott had an obligation to disclose this information to the Rudds and,

---

ferent agents, affiliated with the same broker, represent different parties to the transaction, the broker is a dual agent, whereas each agent solely represents the party with whom they have the relationship. RCW 18.86.020(2). As a dual agent, the broker owes a duty of confidentiality to both the seller and the prospective purchaser, RCW 18.86.060(2)(d), and may take no action "adverse or detrimental to either party's interest in a transaction." RCW 18.86.060(2)(a). This legislation, however, was not in effect at the time of this transaction and is only prospective in application. RCW 18.86.900 ("[t]his chapter does not apply to an agency relationship entered into before January 1, 1997").

by not doing so, injured Sing by not allowing him to compete for the property.

We disagree that these actions constitute an unfair or deceptive act or practice. Sing never proffered a written offer indicating he would pay the purchase price or more for the property. If this was his intention he could have made a written offer to the Rudds. Instead, Pennock testifies that Sing directed him to offer $41,000 to the Rudds. Additionally, although Sing states that when he viewed the Rudd property he told Pennock he would pay full price or more for the Rudds' property, Pennock testified that he did not remember such a statement by Sing.

The only information Prongay had was that Sing would "probably" accept the counteroffer when he returned. Both Prongay and Pennock testified that only a signed offer is a legal contract and that it is not uncommon for potential purchasers to say they will purchase a piece of property and then never follow through. In this case, Sing could have signed the counteroffer on Friday and he would have had the property. By waiting, he took a risk of someone else making a better offer that could be accepted by the Rudds.

We cannot say that Scott violated the CPA by not starting a "bidding war" on the property. Although such a tactic is appropriate in some cases, this is a judgment that must be made by the agent and seller depending on the situation at hand. In this case, the property had been on the market for over two years. Four previous offers had fallen through due to feasibility study contingencies. According to Prongay, the sellers expressed wariness of a long contingency period and were anxious to accept a full price offer with a short contingency clause.[4] Although Sing testified that he told Pennock he might go above asking price, in fact he had not signed the counteroffer nor communicated what price or terms he might be amenable to if a bidding war were initiated.

---

[4] In Sing's offer to the Rudds he asked for a 45-day feasibility study contingency period and the Rudds countered with 21 days. The Buckleys' offer contained a much shorter 11-day period.

■ Moreover, there is no clear evidence in the record indicating what factors were determinative to the Rudds.[5] Sing's counsel did not ask Prongay if she told the Rudds that Sing would "probably" sign the counteroffer when he returned and that they may want to consider issuing two simultaneous counteroffers. The burden of production is upon the plaintiff to indicate what information the sellers had when making their decision and their reasons for doing so. They have not met this burden in this case.

Thus, viewing the evidence in the light most favorable to the nonmoving party, we do not find any set of facts which constitute a violation of the Consumer Protection Act. We reverse the decision of the Court of Appeals and find the motion for judgment as a matter of law should be granted. We remand to the trial court for proceedings consistent with this opinion.

DOLLIVER, SMITH, GUY, JOHNSON, and SANDERS, JJ., concur.

TALMADGE, J. (dissenting) — The majority in this case finds no violation of Washington's Consumer Protection Act (CPA), RCW 19.86, when agents of a real estate broker engage in insider trading practices that ultimately injure both the seller of the property and a prospective buyer. When the agents of the real estate broker engage in insider trading practices that undermine the integrity of the real estate market and diminish consumer confidence in market fairness, an unfair deceptive act or practice in trade or commerce under the CPA results. RCW 19.86.030. Therefore, I respectfully dissent.

The majority opinion does not adequately convey the insider trading present in this case. The plaintiff, Peter Sing, in 1987 advised Maureen Buckley, an associate broker with John L. Scott, Inc. (Scott), when buying a piece of view property on Bainbridge Island with Ms. Buckley's help as an agent, that Island properties whose view of

---

[5]The Rudds did not testify at the proceedings.

downtown Seattle could be enhanced by clearing trees were very valuable investments. Buckley took this advice from Sing to heart.

In July 1987, the Rudds listed an undeveloped parcel of Bainbridge Island property with Scott through Jody Prongay, a Scott real estate agent. The property was listed at $45,000. Between July 1987 and the summer of 1989, two offers to purchase the property fell through because of concerns regarding the feasibility of the property for development.

In August 1989, another Scott agent, Bob Pennock, showed the Rudd property to Sing. Pennock assisted Sing in preparing a purchase offer below the listing price. The Sing offer also permitted some 45 days after acceptance to determine whether the property was suitable for development. On Friday, August 18, 1989, Pennock met with Prongay and the Rudds to present Sing's offer to purchase. The Rudds made a written counteroffer at the full listing price of $45,000, increasing the earnest money deposit and shortening the time periods for closing and a feasibility study. Pennock relayed the Rudds' counteroffer to Sing that evening. Sing indicated he probably would accept the counteroffer, but expressed a desire to complete the paperwork on Sunday or Monday morning after he had attended a business trade show in Seattle. Pennock did not convey any sense of urgency to Sing. Pennock did, however, convey to Prongay that Sing would probably accept the offer Sunday evening or Monday morning, but he would be unavailable over the weekend.

On Sunday, Buckley and her husband presented an offer to purchase the Rudd property for $42,000, $1,000 more than the original Sing offer, with shorter closing and feasibility study periods than the Sing offer. Buckley, whose office was located near Prongay's desk, testified at trial that she had reviewed the Prongay listing file, which included the Sing offer. Ultimately, the Rudds sold the property to the Buckleys, although they were never informed Sing would pay the full $45,000 listing price, or perhaps more,

and Sing was not informed directly of the Rudds' activities or the Buckley offer, although Prongay left a message on Sing's voicemail system.

The sale of the Rudd property closed in September 1989. In February 1990, the Buckleys resold the property for $137,500. At the time of trial, the property was assessed at a value of $182,520.

## A. RCW 19.86.030

The majority finds there was no unfair deceptive act or practice within the meaning of RCW 19.86.030 in the conduct of Scott or its agents, as a matter of law, reversing the Court of Appeals and the verdict of the jury.

The purpose of the CPA is to protect the public from unfair, deceptive, and fraudulent acts and to foster fair and honest competition. RCW 19.86.920. To demonstrate an unfair deceptive act or practice in trade or commerce, a "plaintiff need not show that the act in question was *intended* to deceive, but that the alleged act had the *capacity* to deceive a substantial portion of the public." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 785, 719 P.2d 531 (1986). The majority concludes, however, Sing had no standing to uphold the integrity of the marketplace. The majority bases its conclusion on the absence of any statute prohibiting real estate agents from purchasing property listed with their agency where another buyer has made an offer. Majority op. at 32. The majority ignores the duties owed by real estate brokers and agents to sellers and buyers, and condones insider trading practices by Scott and its agents forbidden for nearly identical policy reasons in securities transactions.

## B. Scott's Duties

The central, and fatal, conceptual error in the majority opinion is assuming Maureen Buckley was in the same position as a total stranger buying a piece of Bainbridge Island property on Sunday, August 20, 1989. She was not. Under Washington law, Maureen Buckley, as an associate

broker of Scott, bore special duties both to the Rudds as sellers and to Sing as a potential buyer of the Rudds' property.

### 1. Common-Law Fiduciary Duties

In *Mersky v. Multiple Listing Bureau of Olympia, Inc.*, 73 Wn.2d 225, 228-29, 437 P.2d 897 (1968), we described the duties of a real estate agent to a principal:

> [A] real-estate brokerage firm with whom property is appropriately listed for sale becomes the agent of the seller for the purpose of finding a purchaser. And, from this agency relationship springs the duty and the obligation upon the part of the listing broker, as well as on the part of his subagents, to exercise the utmost good faith and fidelity toward his principal, the seller, in all matters falling within the scope of his employment . . . .
>
> Furthermore, there flows from this agency relationship and its accompanying obligation of utmost fidelity and good faith, the legal, ethical, and moral responsibility on the part of the listing broker, as well as his subagents, to exercise reasonable care, skill, and judgment in securing for the principal the best bargain possible; to scrupulously avoid representing any interest antagonistic to that of the principal in transactions involving the principal's listed property, or otherwise self-dealing with that property, without the explicit and fully informed consent of the principal; and to make, in all instances, a full, fair, and timely disclosure to the principal of all facts within the knowledge or coming to the attention of the broker or his subagents which are, or may be, material in connection with the matter for which the broker is employed, and which might affect the principal's rights and interests or influence his actions.

This is a fiduciary duty. *Ward v. Coldwell Banker/San Juan Properties, Inc.*, 74 Wn. App. 157, 161, 872 P.2d 69 (1994).

In the special circumstances of this case, where the real estate agent becomes a purchaser, additional common-law duties attach. At common law, the sale of the Rudd property to Scott or to any of its agents, like Buckley, would

have been voidable by the Rudds. Until fairly recent times, an agent to sell could not become the purchaser: "It is a rule of law well settled, and founded in the clearest principles of justice and sound policy, that the agent of the seller cannot become the purchaser or the agent of the purchaser. These relations are utterly incompatible with each other." *Copeland v. Mercantile Ins. Co.*, 23 Mass. (6 Pick.) 198, 204 (1828). *See also* FRANCIS B. TIFFANY, LAW OF PRINCIPAL AND AGENT § 107, at 416-17 (1903) (and cases cited therein); *Gardner v. Ogden*, 22 N.Y. (8 Smith) 327, 343-44 (1860) (and cases cited therein). Early on, however, we announced in *Cantwell v. Nunn*, 45 Wash. 536, 540, 88 P. 1023 (1907), that full disclosure by the agent could cure the inherent breach of fiduciary duty when an agent becomes adverse to a principal:

> The law exacts of every agent the utmost fidelity to his principal. He must keep him fully informed as to all his transactions, and the state of the business or interests entrusted to him. Any departure from these rules is a fraud in law. An agent to sell cannot become the purchaser, and an agent to buy cannot be himself the seller. Equity removes from the trustee every temptation to violate his trust by declaring in advance that all such transactions are null and void at the option of the principal[.]

RESTATEMENT (SECOND) OF AGENCY § 390 (1958) provides:

> An agent who, to the knowledge of the principal, acts on his own account in a transaction in which he is employed has a duty to deal fairly with the principal and to disclose to him all facts which the agent knows or should know would reasonably affect the principal's judgment, unless the principal has manifested that he knows such facts or that he does not care to know them.

*See* comment a to RESTATEMENT (SECOND) OF AGENCY § 390 (agent buying from principal must disclose not only the price which can be obtained, but also all facts affecting the desirability of sale, such as the likelihood of a higher price being obtained later, the possibilities of dealing with the

property in another way, and all other matters which a disinterested and skillful agent advising the principal would think reasonably relevant). With disclosure that the agent is now an adverse party in the transaction, the principal has the opportunity to obtain another agent to represent his or her own interests and is no longer entitled to rely on a trust relationship with the original agent who is now a prospective purchaser.

In summary, with respect to the Rudds, Scott, its brokers and agents, including Buckley (an associate broker), Prongay (the listing agent), and Pennock (the selling agent), were all under the constraints a fiduciary relationship imposes. A stranger who might have appeared on the fateful Sunday to bid on the Rudd property would not have had *any* common-law duties to the Rudds or to Sing, let alone fiduciary duties. But Buckley and Scott owed more to the Rudds.

### 2. Statutory Duties

The Legislature enacted the real estate brokers and salespersons act in 1941 "to protect the general public from negligent, unscrupulous, or dishonest real estate operators." *Nuttall v. Dowell*, 31 Wn. App. 98, 108, 639 P.2d 832 (1982); LAWS OF 1941, ch. 252. In 1972 the Legislature amended the act to add the following provisions:

> The director [of the Department of Licensing] may . . . [s]uspend or revoke, levy a fine not to exceed one thousand dollars for each offense, require the completion of a course in a selected area of real estate practice relevant to the section of this chapter or rule violated, or deny the license of any holder or applicant who is guilty of:
>
> . . .
>
> (24) Failing to disclose to an owner his or her intention or true position if he or she directly or indirectly through third party, purchases for himself or herself or acquires or intends to acquire any interest in, or any option to purchase, property.
>
> (26) Any conduct in a real estate transaction which

demonstrates bad faith, dishonesty, untrustworthiness or incompetency.

RCW 18.85.230(24) and (26); Laws of 1972, Ex. Sess., ch. 139, § 19. Thus, Buckley had both a common-law duty and a statutory duty to disclose to the Rudds her position as an associate broker with Scott. Subsection (24) protects the public from deception by requiring disclosure that a potential purchaser is a real estate agent. A stranger has no such duties, and no special characteristics requiring disclosure to potential sellers.

Moreover, Buckley had a statutory duty to conduct herself in a way free of bad faith, dishonesty, or untrustworthiness. She owed this duty both to the Rudds and Sing.

### 3. Common-Law Duties Arising From Contract

Scott had a listing agreement, a contract, with the Rudds. There is an implied duty of good faith and fair dealing in every contract. *Badgett v. Security State Bank*, 116 Wn.2d 563, 569, 807 P.2d 356 (1991). That duty applied to Scott and its agents.

### 4. Professional Ethics

Scott, Buckley, Prongay, and Pennock were all also constrained by the ethical standards of their profession. An excerpt from the Preamble to the Code of Ethics of the National Association of Realtors provides:

> The term REALTOR® has come to connote competency, fairness, and high integrity resulting from adherence to a lofty ideal of moral conduct in business relations. No inducement of profit and no instruction from clients ever can justify departure from this ideal.

10 PATRICK J. ROHAN ET AL., REAL ESTATE BROKERAGE LAW AND PRACTICE § 2.05, at 2-77 (1990). Article 7 of the Code of Ethics of the National Association of Realtors provides:

> In accepting employment as an agent, the REALTOR®

pledges himself to protect and promote the interests of the client. This obligation of absolute fidelity to the client's interests is primary, but it does not relieve the REALTOR® of the obligation to treat fairly all parties to the transaction.

ROHAN at 2-79.

In summary, Scott's conduct in this matter was constrained by a large array of common-law duties, statutory duties, and professional ethical considerations, none of which would have applied to a stranger who might also have wished to make on offer on the Rudd property. Plainly, Buckley was not just another potential purchaser.

5.  Duties Owed to Sing

Although the majority recognizes Scott's fiduciary duty to the Rudds and Scott's duty to obtain the best possible deal for the Rudds, Majority op. at 32, it neglects to determine the concomitant duties a real estate broker or its agents owe to a buyer of property.

Washington case law recognizes a real estate broker or agent owes a duty of general fair dealing and good faith to a buyer, albeit not as extensive a duty as a broker owes to a seller. In *Brock v. Tarrant*, 57 Wn. App. 562, 568-69, 789 P.2d 112, *review denied*, 115 Wn.2d 1016, 802 P.2d 126 (1990), the Court of Appeals stated:

> A broker's duty to a *purchaser* of real property is described in *Hoffman [v. Connall*, 108 Wn.2d 69, 736 P.2d 242 (1987)], at 75:
>
>> The underlying rationale of [a broker's] duty to a buyer who is not his client is that he is a professional who is in a unique position to verify critical information given him by the seller. His duty is to take reasonable steps to avoid disseminating to the buyer false information. The broker is required to employ a reasonable degree of effort and professional expertise to confirm or refute information from the seller which he knows, or should know, is pivotal to the transaction from the buyer's perspective.
>
> (Citations omitted.) *Tennant [v. Lawton*, 26 Wn. App. 701, 706, 615 P.2d 1305 (1980)]; *see also McRae v. Bolstad*, 32

Wn. App. 173, 646 P.2d 771 (1982), *aff'd*, 101 Wn.2d 161, 676 P.2d 496 (1984).

Thus, "a real estate broker must act as a professional, and will be held to a standard of reasonable care[,]" but need not guarantee every statement made by the seller. *Hoffman*, at 77.

Clearly, Washington courts have recognized the existence of a duty owed by a real estate broker to a purchaser of property to act in good faith and to avoid dissemination of false and misleading information.

This duty is also consistent with the 1996 legislation providing that where a broker acts as a dual agent for both the seller and prospective purchaser, the broker owes a duty of confidentiality to both the seller and prospective purchaser, RCW 18.86.060(2)(d), and may take no action "adverse or detrimental to either party's interest in a transaction." RCW 18.86.060(2)(a).

Thus, based on traditional Washington analysis of the duty owed by a real estate broker to a seller or to a purchaser, Scott violated its duty to Sing by virtue of the self-dealing of its agent. Scott breached its fiduciary duty to the Rudds in failing to disclose to them the possibility of two offers from purchasers who would pay at least the listing price, and perhaps more, for their property. As a fiduciary of the Rudds, Scott had a duty to initiate a "bidding war" between Buckley and Sing to secure the best possible price for the sale of the property.[6] Additionally, Scott breached its fiduciary duty to the sellers in this case when Buckley acquired significant information about investment view property on Bainbridge Island that she did not disclose to the Rudds. The Rudds would have benefited from Buckley's knowledge that their property, with the trees

---

[6]Although Buckley and Prongay denied any collusion in arriving at a dollar amount to offer the Rudds, it seems strange Prongay and Pennock never shared the information Sing gave to Pennock that he would be willing to pay more than $45,000 for the property. The jury may very well have doubted that Prongay zealously sought the best price for the Rudds when in fact Prongay's friend and long-time business associate, Buckley, was the bidder competing with Sing, and the bid Buckley first submitted was only slightly more advantageous than Sing's bid. Curiously, Prongay never told Pennock Buckley was competing with Sing.

cleared to allow a Seattle view, was more valuable than they thought. As a subagent of Scott, any valuable knowledge Buckley possessed and used in developing the offer to the Rudds should have been given to the Rudds; this knowledge was imputable to Scott.[7] Buckley used her knowledge of insider information, ironically acquired from Sing, to engage in a transaction that resulted in a profit after only a few months of $92,500.[8]

Moreover, Scott and its agent breached a duty of good faith and fair dealing to Sing. Scott never indicated to Sing any urgency with regard to the transaction so that he would have the option to complete the necessary offer *before* leaving for Seattle. Scott never disclosed to Sing that its own agent was his competitor. With disclosure, Sing may very well have chosen to protect himself by retaining an independent agent and not divulging any more of his thoughts to Scott or its agents.

C.    Fraud on the Market

In addition to the duty analysis, there is another basis for finding an unfair or deceptive act or practice in trade or commerce under the CPA here. In the securities field, the federal courts have developed a fraud on the market theory of recovery. In effect, parties to securities transactions may initiate actions against parties who engage in behavior that

---

[7]The parties have expended a fair amount of energy arguing over what Buckley knew with respect to the Rudd listing and Sing's offer, and when she knew it. These factual disputes are of no consequence. "The ordinary rule is that the knowledge of a servant concerning matters the control or supervision of which has been delegated to him by the master, is the knowledge of the master." *Alaska S.S. Co. v. Pacific Coast Gypsum Co.*, 78 Wash. 247, 252, 138 P. 875 (1914). *See also Zwink v. Burlington N., Inc.*, 13 Wn. App. 560, 566, 536 P.2d 13 (1975) (citing RESTATEMENT (SECOND) OF AGENCY § 9(1) (1958)); *Bauer v. Whispering Hills Assocs.*, 210 A.D.2d 569, 620 N.Y.S.2d 147, 148 (1994) (imputed knowledge rule arises in master-servant relationship); *Hodges v. Gibson Prods., Inc.*, 811 P.2d 151, 157 (Utah 1991) (personal knowledge material to the liability that a servant has when acting in a matter as to which the master has empowered the servant to act is imputed to the master). Thus, whatever Prongay, Pennock, and Buckley knew is all imputed to Scott.

[8]It is unclear from the record whether the Rudds have filed an action against Scott or the Buckleys to require them to disgorge any of the profits obtained in this transaction.

is unfair or deceptive with respect to the operation of the securities market. This theory was described in *Provenz v. Miller*, 102 F.3d 1478, 1489 (9th Cir. 1996), *cert. denied*, 118 S. Ct. 48 (1997):

> Plaintiffs contend that defendants' alleged false and misleading statements defrauded the market by causing the price of MIPS' stock to be overvalued during the class period in question. Thus, plaintiffs' case is based on a "fraud on the market" theory. This court has recognized that where a "fraud on the market" is alleged, plaintiffs are not required to "show that they themselves actually relied on any particular misrepresentation or omission." *[In re] Convergent Techs. [Sec. Litig.*, 948 F.2d 507, 512 n.2 (1991)]* (citing *[In re] Apple Computer, [Sec. Litig.*, 1109, 1113-14 (1989)]*. To show reliance, plaintiffs simply must "show that they relied on the integrity of the price of the stock as established by the market, which in turn is influenced by information or the lack of it." *Id.* Thus, in a "fraud on the market" case, "[a]n investor's reliance on the market . . . is equivalent to reliance upon statements made to the market, or the non-disclosure of material information." *Id.* Defendants do not dispute plaintiffs' allegations of reliance.

Here, Scott precipitated a fraud on the market affecting Sing by failing to inform Sing it had become a competitor for the Rudd property. In *United States v. O'Hagan*, 521 U.S. 642, 117 S. Ct. 2199, 138 L. Ed..2d 724 (1997), the United States Supreme Court recently provided additional impetus to a fraud-on-the-market analysis when it determined that a party who misappropriates insider information violates federal securities law:

> The "misappropriation theory" holds that a person commits fraud "in connection with" a securities transaction, and thereby violates § 10(b) and Rule 10B-5, when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information. *See* Brief for United States, 14. Under this theory, a fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information. In lieu of premising liability on a fiduciary

relationship between company insider and purchaser or seller of the company's stock, the misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information.

. . . .

The misappropriation theory comports with section 10(b)'s language, which requires deception "in connection with the purchase or sale of any security," not deception of an identifiable purchaser or seller. The theory is also well-tuned to an animating purpose of the Exchange Act: to insure honest securities markets and thereby promote investor confidence. *See* 45 Fed. Reg. 60412 (1980) (trading on misappropriated information "undermines the integrity of, and investor confidence in, the securities markets").

*Id.* at 2207 and 2210.

In the present case, Scott's actions ultimately constituted a fraud on the market, insofar as Scott's agent misappropriated information and used it to her distinct advantage, without regard to the interests of the Rudds and Sing. This insider self-dealing to the detriment of the buyer and seller constituted an unfair or deceptive act or practice in trade or commerce for purposes of RCW 19.86, permitting either the buyer or the seller to invoke the remedies of that statute.

In conducting business in the real estate market, the sellers hope and assume the real estate broker and its agents will secure for that seller the best possible price for the sale of the property. Similarly, in dealing with a real estate broker and its agents, the buyer assumes the broker and its agents will provide fair and accurate information and will not engage in conduct for its own benefit to defeat the interest of the buyer, particularly where the buyer has provided specialized information to such a broker and its agents. When a broker and its agents use insider status to, in effect, pull the rug out from under a buyer so as to prevent the seller from getting the best possible price for the sale of property and to deprive the buyer of a fair opportunity to compete for the property, the marketplace is

disrupted artificially and a fraud on the market has occurred.

One imperative of the CPA, the purpose of which is to prevent unfair or deceptive acts in trade or commerce, is to prevent fraud on the market. When a real estate agent hired to sell a principal's property decides to make a bid to buy the property, the agent must either inform other bidders who have submitted bids for her principal's property through the real estate agent's agency of her intent to compete with them, or refrain from competing. Consistent with common law and statute, Scott had an obligation to Sing either to disclose the competition of its agent and allow Sing reasonable time to react to these new circumstances, or to refrain from dealing with the Rudds. This rule assures a level playing field for potential buyers like Sing, and comports with the purpose of the CPA to prohibit unfair or deceptive practices in trade or commerce.

D. Damages

Because of its treatment of the liability question in the case, the majority does not reach the issue of Sing's damages. The Court of Appeals permitted Sing to recover damages for what Sing described as a "loss of appreciated investment value." In effect, the Court of Appeals and the trial court permitted Sing to recover lost profits from the transaction.

Scott argues on appeal a CPA plaintiff cannot recover lost profits because economic damages are not recoverable in a tort action, citing *Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1*, 124 Wn.2d 816, 825, 881 P.2d 986 (1994). Scott's reliance on *Berschauer/Phillips* is misplaced. In that case, we discussed the question of whether a general contractor could recover purely economic damages from a design professional in tort when damages in contract, for breach of warranty, were available. We found economic damages are not recoverable in a tort action under those specific circumstances.

The CPA, however, is not a tort-based remedy. It is a

statutory remedy based on section 5 of the Federal Trade Commission Act, the purpose of which is to forestall unfair or deceptive acts or practices in trade or commerce. Washington courts have found that lost profits may be recoverable in a CPA case if appropriately quantified. *See, e.g., Sign-O-Lite Signs, Inc. v. DeLaurenti Florists, Inc.*, 64 Wn. App. 553, 825 P.2d 714, *review denied*, 120 Wn.2d 1002, 838 P.2d 1143 (1992); *Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 675 P.2d 193 (1983).

The difficulty with permitting a recovery of lost profits or, as styled by the plaintiff, the loss of appreciated investment value, is that such a recovery assumes Sing would have purchased the property but for the unfair and deceptive acts or practices of Scott and its agents. Sing did not lose the property in this case so much as he lost a fair opportunity to compete for the property because of Scott's conduct.

The appropriate measure of damages for Sing here is the value of the lost opportunity to fairly compete in the real estate market for the purchase of the Rudd property. Such a value could be established by expert testimony.

I would affirm the Court of Appeals and the trial court's judgment on the verdict of the jury as to liability. Because the jury was not properly instructed on the measure of damages for such an unfair deceptive act or practice in trade or commerce, I would reverse the judgment as to damages and remand the case for a new trial confined solely to the issue of damages.

DURHAM, C.J., and ALEXANDER, J., concur with TALMADGE, J.