[No. 29804-3-III. Division Three. February 7, 2012.]

JACQUELINE SMITH, *Appellant*, v. BRYAN STOCKDALE ET AL., *Respondents*.

558

*George M. Ahrend* (of *Ahrend Law Firm PLLC*), for appellant.

*Michael A. Patterson* and *Sarah E. Heineman* (of *Patterson Buchanan Fobes Leitch & Kalzer PS*), for respondents.

¶1 KULIK, C.J. — Jacqueline Smith jumped from a cliff on public property adjacent to recreation fee property owned and operated by Bryan Stockdale. Ms. Smith sued Mr. Stockdale and his corporations (collectively Vantage), contending that Vantage violated the Consumer Protection Act (CPA), chapter 19.86 RCW, by deceptively charging Ms. Smith a fee to access the adjacent private property and that Vantage failed to protect Ms. Smith from the danger of cliff jumping. The trial court granted summary judgment in favor of Vantage. The court concluded that Vantage's user fee was not deceptive and that Vantage did not have a duty to protect Ms. Smith from danger on the adjacent public property. We agree with the trial court and affirm.

## FACTS

¶2 *The Property*. Vantage owns property near Vantage, Washington. Vantage owns and operates Vantage River-stone Resort. The waterfront operations are located on lot 23 and include a campground, restroom facilities with showers, and boat moorage. Lot 23 is an improved stretch of waterfront property on the Wanapum Reservoir of the Columbia River. Vantage also owns lot 22, which is located immediately to the north of lot 23.

¶3 A strip of land lies between the lots and the river. This strip of land is known as the "freeboard" area and is owned by the Grant County Public Utility District No. 2 (PUD). Clerk's Papers (CP) at 51. The freeboard area encompasses the cliff and the shoreline. Vantage has a permit to use the portion of the freeboard area adjacent to lot 23. The permit allows Vantage to make improvements to the shoreline. The permit also requires Vantage to maintain the improvements and assume liability for injuries suffered by visitors on the permitted property.

¶4 Vantage does not have a permit to use the freeboard area located adjacent to lot 22. The freeboard area adjacent to lot 22 encompasses the cliff where Ms. Smith sustained her injuries. The cliff portion of the freeboard area appears to be undeveloped.

¶5 *Use of the Shoreline*. The PUD granted permission to Vantage to charge a $5 day use fee for the permitted area located on lot 23. The PUD also granted permission to Vantage to charge the fee because of the large number of individuals who utilize the improved shoreline and swimming area. Individuals are required to pay the fee to the attendant at the front entrance. Vantage distributes wristbands to those who have paid. As many as 10,000 people visited Vantage's fee area in the summer of 2006.

¶6 Under the agreement with the PUD, Vantage must permit public access to the unpermitted portion of the

freeboard area and cannot charge the public to use this area, including the cliff. The public can access the freeboard cliff without crossing Vantage's fee area by using a ramp north of Vantage's permitted area.

¶7 Vantage asked the PUD to help prevent people from jumping from the cliff but Vantage contends that the PUD did not take action. Vantage then placed a wire fence running parallel to the river in order to restrict access to the cliff face. The PUD required that Vantage remove the fence because it restricted access to the public shoreline. Vantage removed this fence. Vantage erected a second fence that marked the boundary line between the camping area and the cliff. Contrary to the PUD's suggestion, Vantage did not remove this fence.

¶8 *Ms. Smith's Use of the Vantage Property*. On July 27, 2006, Ms. Smith was attending a music festival at the Gorge Amphitheatre with several members of her family. Ms. Smith and three of her siblings went to Vantage for a swim. Although Ms. Smith went to Vantage for the purpose of swimming, once she arrived at Vantage, she decided she also wanted to jump off the cliffs because "that's where everybody was." CP at 140.

¶9 Ms. Smith and her siblings parked their car in the parking lot next to the fee area. Ms. Smith and her siblings walked through the grass toward the swimming area. Vantage's fee area encompasses the grassy area. On their way to the swimming spot, a Vantage employee in a golf cart approached Ms. Smith and her siblings to collect the $5 fee. Two of Ms. Smith's siblings ran into the water to avoid paying the fee. Ms. Smith and another sibling ran in a different direction. The two ran toward a small grassy hill in the campground, away from the Vantage employee coming toward them.

¶10 When the Vantage employee approached Ms. Smith and her sibling, they were putting their things down on the grassy hill. The Vantage employee told Ms. Smith that there was "a $5 charge per person that swam." CP at 140. Ms.

Smith told the employee that she did not intend to just swim; she indicated she wanted to jump. The employee told Ms. Smith that the cost was still $5 to swim, jump, and use the facility. Ms. Smith and her sister paid the fee and each received a wrist band.

¶11 *Ms. Smith's Cliff Jump*. After paying the fee, Ms. Smith left her personal items on the grassy hill on the Vantage campground and walked to the cliff. A fence crossed the path that led to the cliff. This section of fence was pushed to the ground. Ms. Smith saw the bowed fence and believes she stepped on it as she walked across.

¶12 When Ms. Smith reached the cliff, there were 7 to 10 people in the cliff jumping area. She watched at least 3 people jump before it was her turn. When it was her turn, Ms. Smith jumped in the water, feet first, with her hands by her side. She knew people typically jumped in this position and believed it was the safest way to enter the water. She estimated the cliff to be 65 feet high. She testified that she characterizes herself as a thrill seeker, and that she jumped off the cliff for the adrenaline rush. Ms. Smith had jumped off cliffs in Oregon prior to her visit to Vantage.

¶13 After jumping, an unidentified local man helped Ms. Smith swim to shore. Ms. Smith had a hard time getting out of the water. Ms. Smith's siblings met her at the base of the cliff. She told her siblings that she was hurt and wanted to leave. They drove immediately to see their mother at the music festival. Ms. Smith's mother drove Ms. Smith to the hospital in Quincy, Washington, where doctors diagnosed Ms. Smith with back and other injuries.

¶14 Ms. Smith sued Vantage for a violation of the CPA and for premises liability. Vantage moved for summary judgment. The trial court granted summary judgment on all claims. The court also reasoned that Ms. Smith's entry onto Vantage's fee area subjected her to the $5 fee so, as a matter of law, it was not deceptive or misleading under the CPA for Vantage to charge Ms. Smith for the use of the fee area. The court also held that Vantage did not owe a duty of care to

Ms. Smith because Vantage did not own or have a permit to use the freeboard area where Ms. Smith was injured.

¶15 Ms. Smith appeals.

## ANALYSIS

■ ¶16 We review de novo an order granting summary judgment. *Veit v. Burlington N. Santa Fe Corp.*, 171 Wn.2d 88, 98-99, 249 P.3d 607 (2011). And we consider the same evidence presented to the trial court. *Lybbert v. Grant County*, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000). The facts, and all reasonable inferences drawn from them, are viewed in the light most favorable to the nonmoving party. *Id.*

■ ¶17 Summary judgment is appropriately granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). Because the reviewing court examines the case de novo, it not only reviews the decision of the trial court but may also determine whether the trial court's decision can be affirmed on alternate grounds. *See State v. Costich*, 152 Wn.2d 463, 477, 98 P.3d 795 (2004).

■ ¶18 *CPA*. The CPA provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." RCW 19.86.020. The purposes of the CPA are "to protect the public and foster fair and honest competition." RCW 19.86.920. To accomplish these purposes, the CPA is to be liberally construed. RCW 19.86.920. In a citizen initiated CPA suit, five elements must be proved: "(1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; (5) causation." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780, 719 P.2d 531 (1986).

¶19 A person injured as a result of a violation of the CPA may seek to recover actual damages, attorney fees, and

costs. *Ambach v. French*, 167 Wn.2d 167, 171, 216 P.3d 405 (2009). A court may also award treble damages for a violation of the CPA. *Id.*

■ ¶20 The CPA does not define the terms "unfair" and "deceptive." "To show a party has engaged in an unfair or deceptive act or practice a 'plaintiff need not show that the act in question was intended to deceive, but that the alleged act had the capacity to deceive a substantial portion of the public.' " *Sing v. John L. Scott, Inc.*, 134 Wn.2d 24, 30, 948 P.2d 816 (1997) (quoting *Hangman Ridge*, 105 Wn.2d at 785). "The purpose of the capacity-to-deceive test is to deter deceptive conduct before injury occurs." *Id.* A communication can be accurate and still be deceptive if the " 'net impression' " it conveys is deceptive. *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 50, 204 P.3d 885 (2009) (quoting *Fed. Trade Comm'n v. Cyberspace.com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006)).

¶21 As an example of a deceptive act, the court in *Panag* ruled that notices based on insurance liability claims were deceptive and misleading because the notices were designed to look like debt collection notices. *Id.* at 47. The insurance notices represented nothing more than an unadjudicated claim for tort damages. *Id.* The court reasoned that the insurance notices had the capacity to deceive a substantial portion of the public because the language could induce people to remand payment in the mistaken belief they had a legal obligation to do so. *Id.* at 47-48.

■ ¶22 An injury under the fourth element of a CPA claim must be an injury to business or property. *Ambach*, 167 Wn.2d at 171-72. The injury does not need to be great or quantifiable. *Id.* at 171 (quoting *Hangman Ridge*, 105 Wn.2d at 792). Personal injuries do not satisfy the injury requirement under the CPA and are not compensable. *Panag*, 166 Wn.2d at 57. "If the deceptive act actually induces a person to remand payment that is not owed, that will, of course, constitute injury." *Id.* at 64.

¶23 The first and fourth elements of Ms. Smith's CPA claim are at issue.

¶24 *Injury*. Ms. Smith clearly states that her recovery under the CPA does not arise from her personal injury, but instead from an injury to her property. She contends that Vantage injured her when it deceptively charged her $5 to jump from the cliff.

¶25 Ms. Smith's injury does not have to be significant. The $5 entry fee was part of Ms. Smith's property. Because Ms. Smith's injury is limited to the entry fee, she meets the fourth element of her CPA claim.

¶26 *Deceptive Practice*. The larger issue revolves around the first element of Ms. Smith's CPA claim. Ms. Smith contends that it was deceptive for Vantage to charge $5 to jump when it did not have permission to charge a fee to use the cliff. Therefore, to create a question of fact, Ms. Smith must provide evidence to show that Vantage's actions could lead a substantial portion of the public to believe that the Vantage's charge was to cliff jump.

¶27 Ms. Smith and two of her siblings admitted to entering the grassy or park area. Vantage's property includes the grassy area. Once on the property, at least one of Ms. Smith's siblings ran into the water to avoid paying the fee. Ms. Smith stated in her deposition that when the Vantage employee approached her about the fee, Ms. Smith was putting her things down on a grassy knoll. The employee told Ms. Smith "that there's a $5 charge per person that swam." CP at 140. Ms. Smith then said that she indicated to the employee that she wanted to jump and the employee said, "[I]t still costs $5." CP at 140. Ms. Smith was standing on the grassy hill during this conversation. According to this version of the conversation given by Ms. Smith, Vantage did not tell Ms. Smith that there was a fee to cliff jump, only for each person who swam. Since Ms. Smith was already on the fee area, it was not misleading for the employee to tell Ms. Smith that she still had to pay the

fee, regardless of whether she wanted to access the cliff or swim.

¶28 When compared to *Panag*, the nature of the $5 fee was not misleading. The Vantage employee correctly stated the fee was $5, regardless of whether Ms. Smith wanted to jump or swim. The conversation is not evidence of a deceptive act. If Ms. Smith utilized the fee area, even if she left to do other activities, Vantage could still charge the $5 fee.

¶29 Later in the deposition, Ms. Smith expanded on the conversation, mentioning swimming in her plans. In this testimony, Ms. Smith never expresses to the Vantage employee that she wanted only to cliff jump or that her activities would be limited to the PUD property.

> Q. . . . So was it the male who spoke to you telling you it was $5 per person to swim?
>
> A. I can't specifically recall what I do recall, I just told you. So I don't know who initially requested the $5. I know I had indicated to him and she took the cash, but—
>
> Q. So you remember telling the male that you wanted to jump and you remember the female taking the money from you; is that correct?
>
> A. Yes.
>
> Q. Would both the male and female have been within earshot when you were talking about jumping?
>
> A. Well, I indicated to him I was—I didn't have intentions to *just* swim. I had intentions to jump because that's where everybody was. There was nobody just swimming at that point.

CP at 140 (emphasis added).

¶30 Ms. Smith stated that she told the Vantage employee that she wanted to jump as well as swim. She reiterated her intent to swim later in the deposition when she said, "We got out of the car with the sole purpose of swimming so we went directly in that direction." CP at 141. Ms. Smith did not make it clear that she wanted only to cliff jump. Again, this conversation is not evidence that the fee paid by Ms. Smith was to cliff jump.

¶31 In her declaration filed one year after her deposition, Ms. Smith gave a different version of events. Ms. Smith stated in her declaration that when she arrived at Vantage, she started walking to the cliff jumping area. The Vantage employee stopped her as she approached the cliff jumping area. She stated that she pointed to the cliff area and asked the employee if she still needed to pay if she "just wanted to jump off of the cliff" because she "did not intend to use any other facilities." CP at 119. She stated that the employee answered that she "still had to pay the fee, even just to jump." CP at 120.

¶32 When a party gives clear answers to unambiguous deposition questions that negate the existence of any genuine issue of material fact, that party cannot then create an issue by affidavit that without explanation merely contradicts previously given clear testimony. *Marshall v. Bally's Pacwest, Inc.*, 94 Wn. App. 372, 379, 972 P.2d 475 (1999) (quoting *Duckworth v. Langland*, 95 Wn. App. 1, 7-8, 988 P.2d 967 (1998)).

¶33 Ms. Smith's declaration contradicts her deposition testimony. She gives a different version of her use of Vantage property and her conversation with the Vantage employee. Ms. Smith's declaration cannot override her previous deposition to create an issue of fact.

¶34 In summary, Ms. Smith used the fee area once she entered and placed her things on the grass. Therefore, the Vantage employee correctly told Ms. Smith that she had to pay, whether she wanted to swim or jump. Ms. Smith does not provide evidence that Vantage charged her only to cliff jump. Ms. Smith fails to create a genuine issue of material fact as to her CPA claim.

¶35 *Negligence*. "A cause of action for negligence requires the plaintiff to establish (1) the existence of a duty owed, (2) breach of that duty, (3) a resulting injury, and (4) a proximate cause between the breach and the injury." *Tincani v. Inland Empire Zoological Soc'y*, 124 Wn.2d 121, 127-28, 875 P.2d 621 (1994).

¶36 In Washington, the possessor of land has a duty of care to persons on their property based on the entrant's common law status as an invitee, licensee, or trespasser. *Curtis v. Lein*, 150 Wn. App. 96, 103, 206 P.3d 1264 (2009), *rev'd on other grounds*, 169 Wn.2d 844, 239 P.3d 1078 (2010). A person is an invitee if he or she is a business visitor invited on the property to conduct business with the possessor of the land. *Younce v. Ferguson*, 106 Wn.2d 658, 667, 724 P.2d 991 (1986) (quoting RESTATEMENT (SECOND) OF TORTS § 332 (1965)). A customer is entitled to expect that the business owner will exercise reasonable care to make the premises safe for his or her entry. *Tincani*, 124 Wn.2d at 138-39 (quoting RESTATEMENT § 343 cmt. b). This duty requires the business owner to inspect for dangerous conditions, followed by such repair, safeguards, or warnings as may reasonably be necessary for the customer's protection under the circumstances. *Id.* at 139 (quoting RESTATEMENT § 343 cmt. b). This duty extends throughout the area that the customer reasonably believes is open to him or her. *Id.* at 140.

¶37 A person is a possessor of land if he or she is

"(a) a person who is in occupation of the land with intent to control it or

"(b) a person who has been in occupation of land with intent to control it, if no other person has subsequently occupied it with intent to control it, or

"(c) a person who is entitled to immediate occupation of the land, if no other person is in possession under Clauses (a) and (b)."

*Ingersoll v. DeBartolo, Inc.*, 123 Wn.2d 649, 655, 869 P.2d 1014 (1994) (quoting RESTATEMENT § 328E).

¶38 Significant here, a property owner does not have a duty to protect visitors from dangers on adjacent lands. *McMann v. Benton County, Angeles Park Cmtys., Ltd.*, 88 Wn. App. 737, 742, 946 P.2d 1183 (1997).

¶39 Ms. Smith relies on *Albin v. National Bank of Commerce of Seattle*, 60 Wn.2d 745, 375 P.2d 487 (1962) to show

that an owner or occupier of land has a duty to prevent harm on adjacent premises when the occupier has knowledge of a dangerous, natural condition on the adjacent premises. In *Albin*, a tree that was standing on the landowner's property fell during a windstorm and struck a car driving on the adjacent county road. *Id.* at 747. The court held that the landowner had no liability to the persons on the adjacent property unless the landowner knew of the dangerous condition created on his land. *Id.* at 752.

¶40 In *Tincani*, a student visiting a zoo left the zoo's main trail to follow a nature trail. *Tincani*, 124 Wn.2d at 125-26. While exploring the nature trail on zoo property, the student fell off a cliff. *Id.* at 126. The trial court stated that a duty to an invitee is limited to the area where the person is invited. *Id.* at 140-41 (quoting RESTATEMENT § 332 cmt. *l*). Therefore, "[i]f the Zoo were negligent in creating boundaries, the area of invitation would have extended to all places a zoo patron reasonably believed were held open to him or her." *Id.* The zoo's negligent marking of the main trail extended the area of invitation for visitors to include the cliff. *Id.* at 141. The court also found that the zoo should have anticipated the harm from the cliff because of the number of children visiting the zoo and because of the zoo's invitation to guests to " 'walk in the wild.' " *Id.*

¶41 While on Vantage's property, Ms. Smith was a business visitor. Vantage owed Ms. Smith a duty of care as an invitee while she was inside the fee area. However, Vantage did not owe a duty of care to Ms. Smith to warn her of the dangers at the cliff. And Vantage did not have a duty to protect visitors from the dangers on the adjacent PUD property. *See McMann*, 88 Wn. App. at 742.

¶42 Ms. Smith mistakenly uses *Albin* as an attempt to expand Vantage's duty of care to the adjacent property. In *Albin*, the landowner's potential liability for the accident on the adjacent public road was derived from the tree that fell from the landowner's property. *Albin*, 60 Wn.2d at 751-52.

In contrast to *Albin* and *Tincani*, Vantage did not have ownership of the land where the cliff is located, nor did Vantage's property have any relation to the dangerous condition on the adjacent cliff property. Vantage's liability does not extend to the adjacent cliff.

¶43 Furthermore, Vantage did not have control over the cliff portion of the PUD property and, therefore, did not possess that land. Contrary to Ms. Smith's contention, Vantage did not treat the cliff as Vantage property. As determined previously, Vantage did not charge a fee to use the cliff. Again contrary to *Tincani*, Vantage did not invite guests to use the cliff. Instead, Vantage attempted to prohibit use of the cliff by erecting a fence to block access and by putting up "no trespassing" signs. Vantage did not owe a duty of care to Ms. Smith to protect her from the dangers associated with the cliff.

¶44 We affirm the decision of the trial court granting summary judgment in favor of Vantage.

KORSMO and SIDDOWAY, JJ., concur.

Review denied at 174 Wn.2d 1013 (2012).